NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-6123-11T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JEROME L. FAUCETTE, a/k/a
LEROY DANIEL THOMAS,

    Defendant-Appellant.

_____

> APPROVED FOR PUBLICATION
>
> **January 15, 2015**
>
> **APPELLATE DIVISION**

        Submitted September 15, 2014 – Decided January 15, 2015

        Before Judges Lihotz, Espinosa and Rothstadt.

        On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 08-08-0865.

        Joseph E. Krakora, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the brief).

        John J. Hoffman, Acting Attorney General, attorney for respondent (Jane C. Schuster, Deputy Attorney General, of counsel and on the brief).

        Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

LIHOTZ, P.J.A.D.

    In reviewing the Law Division's order denying defendant's motion to suppress his custodial statement, we consider not only

whether defendant's statement was voluntarily and knowingly made, but also whether the fourteen-day break-in-custody period following a defendant's invocation of the right to counsel, announced in Maryland v. Shatzer, 559 U.S. 98, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010), and applied by our Supreme Court in State v. Wessells, 209 N.J. 395 (2012), must also be applied when a defendant invokes the right to remain silent. In Shatzer, the United States Supreme Court specifically recognized an enhanced protective period must follow a break in custody caused by a suspect's invocation of the right to counsel. We conclude such an extensive period of protection need not accompany a break in custody caused by a defendant's request to cease the interrogation.

Defendant Jerome L. Faucette was charged under Indictment No. 08-08-0865 with first-degree offenses of felony murder, N.J.S.A. 2C:11-3(a)(3) (count one); and robbery, N.J.S.A. 2C:15-1 (count two). The charges stem from an incident occurring on April 14, 2008, when defendant acted as the driver for co-defendant Terrance S. Clemons, who robbed and shot a gas station attendant. Following trial, a jury acquitted defendant of felony murder, but found him guilty of first-degree robbery. Defendant was sentenced to thirteen years in prison, subject to

the 85% parole ineligibility period required by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Defendant appeals from his conviction and sentence arguing:

POINT ONE
DEFENDANT'S MAY 15, 2008 STATEMENT WAS NOT THE PRODUCT OF A VOLUNTARY, KNOWING, AND INTELLIGENT WAIVER OF HIS RIGHT TO REMAIN SILENT AND, THEREFORE, SHOULD HAVE BEEN SUPPRESSED BY THE TRIAL COURT.

A.   Waiver of Miranda Rights.

B.   Defendant Invoked his Right to Remain Silent.

C.   Fruit of the Poisonous Tree.

POINT TWO
THE PUBLICATION TO THE JURY OF GRAPHIC AUTOPSY PHOTOGRAPHS, WHICH WERE NOT ADMITTED INTO EVIDENCE, WAS ERROR WHICH UNDULY PREJUDICED DEFENDANT.

POINT THREE
THE TRIAL COURT WRONGFULLY DENIED DEFENDANT'S MOTION FOR A NEW TRIAL.

POINT FOUR
DEFENDANT RECEIVED AN EXCESSIVE SENTENCE.

In a separately filed supplemental brief, defendant presents these issues:

ISSUE I
APPELLANT'S CONVICTION FOR FIRST DEGREE ROBBERY ON BASIS OF ACCOMPLICE LIABILITY THEORY REQUIRES REVERSAL FOR INSUFFICIENCY OF EVIDENCE.

ISSUE II
THE TRIAL COURT'S JURY INSTRUCTIONS ON ACCOMPLICE LIABLITY FOR FIRST DEGREE ROBBERY

A-6123-11T3

WERE INSUFFICIENT, DEFECTIVE AND ERRONEOUS AND THE ERROR WAS SO FUNDAMENTAL AS TO CONSTITUTE PLAIN ERROR (PLAIN ERROR).

ISSUE III
DEFENDANT'S MAY 15, 2008 STATEMENT WAS THE PRODUCT OF PSYCHOLOGICAL COERCION AND WAS NOT THE PRODUCT OF A VOLUNTARY, KNOWING AND INTELLIGENT WAIVER OF HIS RIGHT TO REMAIN SILENT AND THEREFORE SHOULD HAVE BEEN SUPPRESSED BY THE TRIAL COURT.

Following our review of these issues, in light of the record and the applicable law, we affirm.

I.

In Point One and Issue III, defendant challenges the voluntariness of his custodial statements. These facts are taken from the record of the three-day Miranda[1] hearing, during which Detective Stephen Craig was the sole witness and the State admitted DVD recordings of defendant's custodial interviews.

On May 14, 2008, Detective Craig and another police detective met defendant at his place of employment around 7:00 p.m. and asked if he would come with them for questioning. Once at the police station, the detectives advised defendant of his Miranda rights.

At approximately 8:00 p.m., defendant stated he "d[id not] want to be [t]here" and "[he] want[ed] to be at work working, go

---

[1]    Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

home and get in [his] bed and then wake up and do the whole same thing again." Thereafter, he asserted, "I ain't going to talk [to] you I just want to leave, my God," and "I'm done talking yo." Despite these protests, which were repeated, Detective Craig continued the interrogation, which lasted for seven hours. Police did not charge defendant and drove him home at approximately 2:30 a.m.

That same day, police returned to defendant's home at approximately 4:30 p.m. and asked him to accompany them to the prosecutor's office. Police had requested a warrant for defendant's arrest, which had not yet been issued. Defendant agreed to go with the officers and his mother followed in her car. Defendant's mother stayed in the lobby, while defendant was taken into an interview room.

Detective Craig advised defendant of his <u>Miranda</u> rights, "read[ing] them aloud from a standard <u>Miranda</u> card," which defendant signed and dated.[2] Upon receipt of the warrant, he also informed defendant he was under arrest for "murder and . . . related offenses" and provided a copy of the warrant reflecting the charges. The detectives also confronted defendant with information police had gathered from other witnesses since defendant's earlier interview.

---

[2]    Defendant did not execute a waiver of his <u>Miranda</u> rights.

Specifically, Detective Craig learned Detective Brian Weisbrot, the lead investigator on the case, questioned Ms. Spencer, defendant's former girlfriend, and Mr. Gaddy,[3] defendant's friend. Spencer told police defendant admitted he and Clemons were involved in the robbery and shooting. Spencer then revealed this to Gaddy, who confirmed what she had told him.

Defendant responded emotionally to this news, screaming, crying, protesting his innocence, insisting he was telling the truth and pacing around the room. After calming down, and upon further police interrogation, defendant described his role in the gas station robbery and killing. Defendant admitted he knew Clemons intended to rob the gas station because he told him "it's easy . . . it's an easy spot to go get." Despite initially declining, defendant agreed to "just drive [Clemons] around." At 11:00 p.m., he dropped Clemons off at the gas station, and waited in his vehicle for Clemons to "go[] and do[] it." Clemons returned to the car and during the drive back, told defendant "he shot the guy," meaning the attendant, stating "[he] shot him in his leg and then he was on the ground and he . . . just shot him" in the head. The victim later died of the inflicted gunshot wounds.

---

[3] Mindful that our opinion will be posted on the internet, we have omitted the full names of witnesses wherever possible to protect their privacy.

Defendant told police, shooting the attendant was not part of the plan. He insisted "[he] didn't know [Clemons] had a gun on him" and told detectives he did not take any of the proceeds of the robbery. When asked if Clemons wore a mask, defendant responded Clemons had a "bulgy pocket," which he thought "could have had a mask in there . . . ." Defendant also recounted driving Clemons to his girlfriend's house after the shooting, and encountering Spencer, who he told about the robbery, including how "[Clemons] shot somebody."

Throughout the interview, defendant did not appear to be under the influence of alcohol or controlled substances, nor did he display "visual signs of injury or any complaint of any type of injury that would have precluded [the police] from speaking with him." Detective Craig noted defendant, "appeared to be well rested," "cognizant of the communications [the detectives] were having with him" and to understand the rights as explained to him. According to Detective Craig, defendant declined to invoke his right to remain silent and agreed to answer questions without an attorney present.

In a written statement accompanying his order, the Law Division judge credited Detective Craig's testimony. The judge found, in the first meeting with police, defendant expressed a desire to end the interview after one hour of questioning.

Thereafter, the interview "bec[ame] an interrogation" and "continued in a persistent, relentless fashion" and was "laced with . . . defendant's continued protestations . . . ." Thus, the court found "[p]atently, beginning at 8:03 p.m., the detectives failed to comply with the dictates of Miranda," a point the State conceded.

Nevertheless, despite the "flagrant" Miranda violations on May 14, the "extensive" questioning that night "did not deprive . . . defendant of the normal use of his faculties, nor did it constitute psychological manipulation that diminished his free will," when questioned a second time. Regarding the second interview, the trial court made the following factual findings:

> Initially, . . . defendant, often screaming or crying, denied any involvement or saying anything to Spencer about the gas station crimes. The detectives confronted . . . defendant with his inconsistent statements or failure to disclose, while prying from him gradual admissions of involvement. At no time did he make any request, even a subtle one, to terminate the interrogation or to have a lawyer. Although he probably had no more than five hours sleep the previous night, he exhibited no signs of sleep deprivation, mental incapacity or being physically overwhelmed.
>
> Mid-way through the interrogation, the defendant, becalmed, gave narrative statements during an eight-minute segment, admitting that he served as the driver for Clemons who committed a robbery at the . . . gas station, and the later robbery-murder at the . . . [g]as station. Throughout the

> balance of the interrogation . . . defendant
> was calm and cooperative.

The judge reasoned that neither the length of the interviews nor their proximity in time nullified the voluntariness of defendant's statements made in the second interview. The judge found statements in that interview were voluntarily made, as "[a] review of the recorded interrogations reveal[ed] a defendant of normal intelligence, free of any indicia of influential alcohol or medications, able to understand the questions posed and respond to them." Moreover, the judge determined defendant's May 15 statement did not constitute "fruit of the poisonous tree," noting he was again read his Miranda rights prior to the second interview; the interviews were separated by more than fourteen hours; and defendant was confronted with additional evidence at the later interview. Accordingly, the judge concluded "[t]he record reflect[ed] compliance with Miranda" during the May 15 interview, as "defendant made no request to terminate questioning or ask for a lawyer."

The December 14, 2011 order suppressed defendant's statements made after 8:03 p.m. on May 14 until the early morning hours of May 15. However, the balance of defendant's statements to police were deemed admissible, including his May

disclosure of his role in the crime made after a second issuance of <u>Miranda</u> warnings.

The principal issue on appeal is whether, examining the totality of the circumstances, defendant's second custodial statement was freely and voluntarily given. Defendant argues his admission "was extracted in violation of [his] right to remain silent" and contends it was the "product of government coercion[,] which . . . overcame [his] will." Defendant also posits the judge erred because the initial questioning, which the State conceded violated <u>Miranda</u>'s protections, "cannot neatly be separated" from the subsequent interview, rendering any statements made during this latter interview "fruit of the poisonous tree."

"[A] finding of compliance with <u>Miranda</u> and voluntariness turn[s] on factual and credibility determinations . . . ." <u>State v. W.B.</u>, 205 <u>N.J.</u> 588, 603 n.4 (2011). In our review, we determine whether there is "sufficient credible evidence in the record to sustain the trial judge's findings and conclusions." <u>Ibid.</u> If so, our "task is complete and [we] should not disturb the result . . . ." <u>State v. Johnson</u>, 42 <u>N.J.</u> 146, 162 (1964). In our review, we defer to the trial judge's factual findings that are "'substantially influenced by his [or her] opportunity to hear and see the witnesses and [develop a] feel of the case,

which a reviewing court cannot enjoy.'" State v. Davila, 203 N.J. 97, 109-10 (2010) (quoting Johnson, supra, 42 N.J. at 161) (internal quotation marks omitted). However,

> when the trial court's sole basis for its findings and conclusions is its evaluation of a videotaped interrogation, there is little, if anything, to be gained from deference. In that circumstance, . . . appellate courts are not confined to a review of a transcript nor obliged to defer to the trial court's findings, but may consider the recording of the event itself.
>
> [State v. Diaz-Bridges, 208 N.J. 544, 565-66 (2011) (citing State v. Alston, 204 N.J. 614, 626 n.2 (2011)).]

Importantly, if necessary, this court will not "hesitate to make new fact findings on the record in a situation where the findings are not exclusively factual but intertwined with legal conclusions drawn from the Miranda case and its progeny." State v. Godfrey, 131 N.J. Super. 168, 174-75 (App. Div. 1974) (citing State v. Yough, 49 N.J. 587, 596 (1967)), aff'd, 67 N.J. 80 (1975). Generally, if "a trial court's findings [are] so clearly mistaken 'that the interests of justice demand intervention and correction[,]' . . . an appellate court properly reviews 'the record as if it were deciding the matter at inception and make[s] its own findings and conclusions.'" State v. Hreha, 217 N.J. 368, 382 (2014) (quoting Johnson, supra, 42 N.J. at 162). Further, we are not bound by a trial

court's resolution of legal issues, which remain subject to our de novo review. State v. Shaw, 213 N.J. 398, 411 (2012).

Defendant's constitutional challenge invokes his right to remain silent. "The Fifth Amendment privilege against self-incrimination, made applicable to the states through the Fourteenth Amendment, provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" State v. P.Z., 152 N.J. 86, 100 (1997) (quoting U.S. Const. amend. V). Under New Jersey law, "the right against self-incrimination is founded on a common-law and statutory . . . basis," but similarly establishes "'no person can be compelled to be a witness against himself.'" State v. Reed, 133 N.J. 237, 250 (1993) (citation omitted). Attendant to this right is the "absolute right to remain silent while under police interrogation . . . ." Ibid.

Because the privilege against self-incrimination is not self-implementing, the right is safeguarded through the use of Miranda's "'prophylactic-procedural safeguards . . . .'" State v. Knight, 183 N.J. 449, 461 (2005) (quoting State v. Burris, 145 N.J. 509, 520 (1996)). Without question, "[c]onfessions obtained . . . during a custodial interrogation are barred from evidence unless the defendant has been advised of his or her constitutional rights." Ibid. (citing Miranda, supra, 384 U.S.

at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 707). Moreover, it is the State which bears the burden of "prov[ing] the voluntariness of a confession beyond a reasonable doubt." State v. Galloway, 133 N.J. 631, 654 (1993).

Our "inquiry begins with whether the suspect invoked his or her right to remain silent." Diaz-Bridges, supra, 208 N.J. at 564. "'If [an] individual indicates in any manner, at any time prior to or during questioning, that he [or she] wishes to remain silent, the interrogation must cease.'" State v. Hartley, 103 N.J. 252, 263 (1986) (quoting Miranda, supra, 384 U.S. at 473-74, 86 S. Ct. at 1627-28, 16 L. Ed. 2d at 723). "Although a clear assertion of [the] right must of course be scrupulously honored, officers confronted with an ambiguous invocation are authorized to make inquiry in order to clarify the suspect's intent." Diaz-Bridges, supra, 208 N.J. at 569.

> As it relates to the invocation of the right to remain silent, both the words used and the suspect's actions or behaviors form part of the inquiry into whether the investigating officer should have reasonably believed that the right was being asserted. As a result, the court's inquiry necessarily demands a fact-sensitive analysis to discern from the totality of the circumstances whether the officer could have reasonably concluded that the right had been invoked.
>
> [Id. at 565.]

When assessing the validity of a defendant's waiver of his right to remain silent, a court considers the totality of the circumstances, including both the characteristics of the defendant and the nature of the interrogation. Ibid. Relevant factors "include the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved." Galloway, supra, 133 N.J. at 654.

In this matter, defendant maintains "during the May 15[] interrogation, he both clearly and equivocally invoked his right to remain silent, and . . . therefore, the police should have terminated the interrogation." For support, he emphasizes that when the second interview commenced, he expressed an unwillingness "to be here." Defendant presents several reasons he believes demonstrate his statement was involuntary. We have considered and rejected each of these arguments.

The important facts influencing our review are repeated. Defendant willingly accompanied police to the prosecutor's office for further questioning. He rode with police, unrestrained, and was taken to an interview room. Defendant was left alone for a few minutes, then Detective Craig and his colleagues entered the room and read defendant his rights.

14

Defendant initialed the Miranda card, acknowledged it was read to him and noted he understood the rights, including the right to remain silent and the right to terminate questioning at any time. By then, Detective Craig had obtained the arrest warrant and told defendant he was charged with armed robbery and murder. Defendant initially could not control his emotions. He repeatedly denied culpability and insisted he had been truthful and Spencer was lying. However, as police revealed the evidence gathered, defendant changed his position and began to relate those facts evincing his participation. Detective Craig informed defendant both Clemons and Spencer had implicated him. He revealed Spencer's statement included the number of times and locations where the attendant was shot, information not made public, and only available to Spencer because defendant had told her. Detective Craig repeated he had no interest in defendant's denials, assertions of ignorance or attempts to minimize his involvement in the incident. He said he did not believe defendant's claims and gave him "one last chance" to state his involvement and provide new information. At that point defendant confessed.

Defendant never requested the questioning cease. More important, he never invoked his right to counsel. Rather, he continued the interview, offering the events as he knew them.

15

As the conversation continued, defendant gradually admitted he drove Clemons and "dropp[ed] him off" at the service station. Defendant admitted he asked Clemons "what he was going to do," and Clemons responded, "I'm about to go get some money." He also told the detectives, Clemons said "he shot the man and he probably killed him."

As the trial judge noted, defendant, although emotional and, at times crying and screaming because he was arrested and going to jail, never exhibited fatigue, confusion or any inability to comprehend what was happening. He understood his rights, understood he was charged with first-degree offenses and clearly understood police spoke to Clemons and Spencer. Police never threatened or coerced defendant; they told defendant they thought he was lying, believed he was involved and suggested he look out for himself. When told he had one last chance to tell the truth, defendant sat calmly and clearly responded to the detectives' questions.

Reviewing the DVD and Detective Craig's testimony, we concur with the trial judge that defendant did not invoke his right to remain silent. He was not coerced, but ultimately convinced to confess his role to aid his self-interests. He was calm and related detailed information in response to the detectives' inquiries. Considering the words used and

16

defendant's behaviors as depicted on the DVD, we find defendant waived his right to remain silent. See Diaz-Bridges, supra, 208 N.J. at 565. Accordingly, we conclude he knowingly and voluntarily provided his statement of his role in the crimes and interaction with Clemons on April 14, 2008.

Addressing defendant's contention he lost his ability to make "an intelligent evaluation of the situation and [form] a voluntarily intention to make a statement without the assistance of counsel" after being told he was charged with murder, we are not persuaded. "[T]he fact that [a] defendant was distressed and emotional is not by itself sufficient to render his [or her] confession involuntary." Galloway, supra, 133 N.J. at 657.

Defendant argues his confession was "the product of intimidation, coercion and deception," as police capitalized on his fear of Clemons' retaliation against him or his mother, essentially forcing him to talk. He cites as a threat, Detective Craig's comment he would "drop [him] downstairs," meaning take him to the county jail where Clemons was being detained, "if he didn't start talking."

Having considered the events depicted on the DVD, we reject defendant's argument as lacking merit. Use of psychological tactics is not prohibited. Miller v. Fenton, 796 F.2d 598, 605 (3d Cir. 1986). "Unlike the use of physical coercion, . . . use

of a psychologically-oriented technique during questioning is not inherently coercive." Galloway, supra, 133 N.J. at 654. Such ploys may "play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." Miller, supra, 796 F.2d at 605. Cf. State v. Patton, 362 N.J. Super. 16, 32 (App. Div.) ("[A] police officer in the interrogation process may, by the officer's statements, make misrepresentations of fact or suggest that evidence in the form of reports or witnesses exist that will implicate a suspect."), certif. denied, 178 N.J. 35 (2003).

Here, no physical force or threats of same were made. The interview was not lengthy, lasting a little more than an hour. During the interrogation, there were no signs defendant was fatigued, confused or under the influence of intoxicating substances. Detective Craig's comments expressed frustration with defendant's changing story, but the remark "[w]e're not offering to do anything for you other than drop you downstairs in the middle of the population and you fend for yourself," merely stated police responsibility to effectuate the arrest warrant and place defendant in jail.

As to the police discussion of Clemons' past violence and affiliation with a gang, these facts were known to defendant,

who admitted he had known Clemons for a long time. Police acknowledgement and discussion of these facts was not the "'very substantial' psychological pressure[]" necessary for finding a defendant's will was overborne. State v. Cook, 179 N.J. 533, 563 (2004). Accordingly, we reject the notion Detective Craig's comments acted to "strip[] defendant of his capacity for self-determination and actually induce the incriminating statement . . . ." State v. Fletcher, 380 N.J. Super. 80, 89 (App. Div. 2005) (citation and internal quotation marks omitted).

Defendant suggests requests to have his mother present in the room constituted equivocal assertions of his right to remain silent. We disagree.

Before Detective Craig informed him of the charges, defendant, who was age twenty-two, asked "[w]here's my mom," as he thought "my mom[] is gonna be here." Once informed of his arrest, defendant exclaimed, "I thought you were going to be bringing my mom in here." Subsequent to revealing his role in the robbery, defendant requested "[c]an my mom be in here while . . . we do this, please?" At that point, Detective Craig replied "she's a little tied up right now," but later he would "take a break at a certain point [and he would] go find out where she's at [sic] . . . ." Toward the end of the interview, defendant again asked for his mother.

The Court recently

> considered the analytical implications of requests by an adult to speak with someone other than an attorney, concluding that such requests do not imply or suggest that the individual desires to remain silent. See, e.g., State v. Martini, 131 N.J. 176, 228-32 (1993) (concluding that defendant's request to speak with paramour before "lay[ing] out his entire involvement" was not an invocation of right to remain silent); State v. Timmendequas, 161 N.J. 515, 616 (1999) (concluding that request to speak with housemate was not, under the circumstances, invocation of right to remain silent).
>
> [Diaz-Bridges, supra, 208 N.J. at 567.]

The Court explained, "[a]lthough the mere request by an adult to speak with a parent does not equate to an invocation of the right to remain silent, it does necessitate a review of the context in which the request was made." Ibid. Often "it [is] not the request to speak with the parent, but that request in the context of other facts that [gives] rise to the conclusion that the right to silence had been invoked." Id. at 568.

Here, defendant made an inquiry of his mother's whereabouts and repeated his belief she was to be present. Detective Craig told him he would check during a break and later advised defendant could see his mother before he was placed in jail. Nothing about defendant's requests reflect continuation of the conversation was contingent on his mother's presence. Rather, defendant's statements suggest a desire for support and cannot

20

be construed as an assertion of his right to remain silent. See id. at 556, 572 (concluding the defendant's "frequent[] and fervent[]" expressions of his desire to speak with his mother over the course of a ten-hour interview did not amount to an invocation of his right to remain silent).

Defendant's final suggestion is the judge mistakenly found he executed a waiver of his Miranda rights, which led to the erroneous conclusion his statement was voluntary. We are not persuaded.

There was no written Miranda waiver executed. However, "[f]ailure to sign a form of waiver does not preclude a finding of waiver, nor does it make further questioning a violation of [a] defendant's constitutional rights." State v. Warmbrun, 277 N.J. Super. 51, 62 (App. Div. 1994) (citation and internal quotation marks omitted), certif. denied, 140 N.J. 277 (1995). Defendant orally acknowledged he understood his rights, including the rights to not say a word and to cease the interview at any time.

The trial judge's conclusions were made after considering the totality of the circumstances presented. State v. Nyhammer, 197 N.J. 383, 402, cert. denied, 558 U.S. 831, 130 S. Ct. 65, 175 L. Ed. 2d 48 (2009). They were not based, as defendant suggests, on a mistaken factual finding he had executed a

written waiver. We determine the facts support the conclusion that defendant knew and understood his rights, which he intelligently, knowingly and voluntarily waived in admitting his culpability.

Although not directly raised, we consider whether the minimum break in custody delineated in Shatzer and applied in Wessells must be imposed under these facts where the break in custody occurs when a defendant seeks to end the interrogation. Following our review, we conclude it does not. Wessells adopted the rule announced in Shatzer, regarding custodial statements made following the invocation of the right to counsel. Wessells, supra, 209 N.J. at 413. In Shatzer, the United States Supreme Court recognized what had become known as an exception to the longstanding Edwards rule, which mandates interrogations cease once a suspect invokes the right to counsel, until counsel is provided or the suspect later re-initiates communication. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1885, 68 L. Ed. 2d 378, 386 (1981). Jurisprudence developed to consider a "break-in-custody exception" to the bright-line rule Edwards established, whereby the coercive taint of interrogation and presumptive involuntariness of statements made during reviewed interrogation were eliminated. Wessells, supra, 209 N.J. at 404-07. Specifically, the issue considered was whether

a break in custody followed by a waiver of rights nullified the prior invocation of the right to counsel and allowed police to renew interrogation.  See id. at 404-05 (discussing post-Edwards holdings addressing the break-in-custody exception).

In Shatzer, the United State Supreme Court defined the scope of this required break in custody.  The Court held any statements made by a defendant less than fourteen days following invocation of the right to counsel were presumptively involuntary and must be suppressed.  Shatzer, supra, 559 U.S. at 111, 130 S. Ct. at 1223, 175 L. Ed. 2d at 1057.  See also Edwards, supra, 451 U.S. at 484, 101 S. Ct. at 1884, 68 L. Ed. 2d at 386 (noting "additional safeguards are necessary when the accused asks for counsel").  As discussed, our Court in Wessells adopted this fourteen-day standard to define the break-in-custody exception, once the right to counsel had been invoked. Wessells, supra, 209 N.J. at 413.

The rules in Shatzer and Wessells were limited to the right to counsel.  Although the opportunity presented itself, the United States Supreme Court and our Supreme Court did not extend the fourteen-day break-in-custody requirement to invocation of other constitutional protections.  A review of precedents leads to the conclusion Shatzer's fourteen-day rule is specific to the

right to counsel and is not generally imposed if a defendant asserts the right to remain silent.

The Fifth Amendment right to counsel is distinguishable from the right against self-incrimination, and actually is an additional protection against self-incrimination. See Michigan v. Mosley, 423 U.S. 96, 104 n.10, 96 S. Ct. 321, 326 n.10, 46 L. Ed. 2d 313, 321 n.10 (1975) (acknowledging the invocation of the right to counsel provides additional protection against self-incrimination); State v. Reed, 133 N.J. 237, 258, 262 (1993) (noting the right to counsel is distinct from the right against self-incrimination). It is well-settled the State has the burden to show a defendant relinquished the right to counsel. State v. McCloskey, 90 N.J. 18, 28 (1982). This burden is "heavy" and will not be implied. Ibid. Further, the administration of new Miranda warnings has been held insufficient to provide the necessary safeguards to ensure a waiver is valid once legal representation is requested. Id. at 27; see also Mosley, supra, 423 U.S. at 104 n.10, 96 S. Ct. at 326 n.10, 46 L. Ed. 2d at 321 n.10. On the other hand, safeguards for self-incrimination alone have not been so circumscribed.

A voluntary intelligent statement by a defendant fully informed of his rights is admissible. "[A] suspect is always

free to waive the privilege and confess to committing crimes," so long as the waiver is not the product of police coercion. State v. Presha, 163 N.J. 304, 313 (2000).

Following our assessment of the totality of circumstances surrounding the arrest and interrogation, including such factors as "the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved," as well as defendant's "previous encounters with the law," State v. Miller, 76 N.J. 392, 402 (1978), we reject defendant's argument that his "second statement represented nothing more than a continuation of the first." We discern no due process violations by police in conducting the May 15 interview.

Substantially for the reasons identified by the trial judge, we conclude the second interrogation, preceded by newly administered Miranda warnings, resulted in defendant's voluntary uncoerced choice to reveal his involvement in the crimes under investigation. There is no poisonous taint from the May 14 Miranda violations requiring exclusion of his confession.

Importantly, defendant never invoked the right to counsel, which would require the extra protections discussed in Shatzer and Wessells. Here, the break in custody resulted because

defendant said nothing inculpatory during the first interview and was allowed to leave. We recognize that interrogation should have ended sooner, but ultimately defendant was taken home.

The first and second interviews were separated by fourteen hours, during which defendant was not in custody, but home and free to move about as he chose. When police asked him to accompany them to the prosecutor's office because Detective Craig wanted to ask him additional questions, he freely agreed, fully cognizant of the subject matter and the fact that police wanted to question him further. Prior to commencing any questioning, Detective Craig carefully read each right afforded defendant under <u>Miranda</u>, and asked him each time if he understood that right. Defendant acknowledged he understood his rights both orally and by initialing the <u>Miranda</u> card. Once police informed defendant they obtained sufficient information showing he was with Clemons during the robbery and murder, satisfying the requirements to secure an arrest warrant, defendant confessed. We conclude this confession was admissible and the judge properly denied defendant's motion to suppress.

Defendant's next argument advanced the exclusion of his custodial statement invoking the "fruit of the poisonous tree" doctrine. Defendant maintains the "egregious constitutional

violations" of the initial interview tainted the subsequent questioning and his custodial statement is inadmissible as "fruit of the poisonous tree." Following our review, we conclude this argument is unavailing.

"The fruit-of-the-poisonous-tree doctrine denies the prosecution the use of derivative evidence obtained as a result of a Fourth or Fifth Amendment violation." State v. O'Neill, 193 N.J. 148, 171 n.13 (2007) (citations omitted). Our Supreme Court noted the doctrine as developed by United States Supreme Court holdings had "'never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.'" Ibid. (quoting United States v. Bayer, 331 U.S. 532, 540-41, 67 S. Ct. 1394, 1398, 91 L. Ed. 1654, 1660 (1947)). "Under either state or federal law, the critical determination is whether the authorities have obtained the evidence by means that are sufficiently independent to dissipate the taint of their illegal conduct." State v. Johnson, 118 N.J. 639, 653 (1990).

In this regard, "when law-enforcement authorities obtained an initial confession in violation of the defendant's common-law privilege against self-incrimination," a subsequent confession made despite properly informing a defendant of his rights may be

excluded. Id. at 652. The critical factual examination is whether a second statement was the product of unconstitutional police conduct tainting the first, considering "the time between confessions, any intervening circumstances, whether there was a change in place, whether the defendant received an adequate warning of his rights, whether [the] defendant initiated the second confession, the effect of his having made a confession, and the purpose and flagrancy of police misconduct." Hartley, supra, 103 N.J. at 283 (citation and internal quotation marks omitted).

When viewing all facts and circumstances, we conclude, as did the trial judge, defendant's confession was not the culmination of coercion carrying over from the previous night, but of his own volition upon learning the new evidence against him. The information obtained from Spencer constitutes "intervening circumstances" separating the tenor and outcome of the two periods of questioning. See ibid.

As the trial judge considered, the gaps between the two interrogations allowed defendant to freely return home to his family. He rested and showed no signs of fatigue. Although he had insisted on ending the May 14 examination, he freely accompanied police during the early evening on May 15 when told they had more questions for him. Before a single question was

uttered, defendant was advised of his <u>Miranda</u> rights and informed of the charges against him, as set forth in the warrant presented. Finally, defendant had prior interactions with the criminal justice system and repeatedly acknowledged he was aware of and understood his rights. Defendant made no specific inculpatory statements on May 14. Police brought defendant in on May 15 because Spencer and information obtained during the continued police investigation linked him to the gas station robbery and shooting.

Based on these facts, we do not agree the two periods of questioning were inextricably linked such that the May 15 statement was somehow tainted. Therefore, there was no evidence wrongfully obtained that led to the additional questioning. We conclude defendant's confession was the product of constitutionally appropriate procedures. It did not result from police misconduct.

## II.

Defendant also challenges the introduction of graphic autopsy photographs, during the medical examiner's testimony, which depicted death-rendering wounds of the victim. Defendant characterizes this evidence as "unduly inflammatory." Succinctly, the judge's ruling allowed the photographs as a demonstrative aid to the coroner's testimony; they were not

introduced into evidence. See State v. Scherzer, 301 N.J. Super. 363, 434 (App. Div.) ("There is nothing inherently improper in the use of demonstrative or illustrative evidence."), certif. denied, 151 N.J. 466 (1997).

Importantly, defendant has not provided the challenged exhibits in the appellate record. Nonetheless, the issue does not require discussion because no demonstrated prejudice resulted to defendant by the use of the photographs because the jury acquitted defendant of felony murder, showing it thoroughly evaluated all evidence in reaching its verdict. See State v. Dellisanti, 203 N.J. 444, 463 (2010) (noting an error did not deprive the defendant of a fair trial where the jury ultimately acquitted him of a related charge).

### III.

Finally, we reject, as lacking merit, defendant's related claims (1) the judge erroneously denied his motion for a new trial, R. 3:20-1, which asserted the State failed to prove all elements of armed robbery (Point Three); (2) the State failed to prove each element of accomplice liability related to the armed robbery such that his motion for acquittal should have been granted, R. 3:18 (Issue I); and (3) the jury charge on this offense was flawed (Issue II). The challenges key on the intent element, as defendant argues no evidence showed he "shared the

intent with . . . Clemons to commit an armed robbery." See State v. Sims, 140 N.J. Super. 164, 173 (App. Div. 1976) ("It is clear in New Jersey that a defendant can be held as an aider or abettor only if he [or she] had the same criminal intent that must be possessed by the principal wrongdoer.").

The arguments are rejected substantially for the reasons set forth by the trial judge. Specifically, the State presented circumstantial evidence, which if accepted by the jury, proved defendant's knowledge and aid in completing the armed robbery of the gas station. He knew Clemons "possessed guns" and expressed a desire "to get money"; revealed he and Clemons selected the gas station for the robbery because it was "an easy spot to go get"; drove Clemons to the gas station and waited for his return; "parked the vehicle at a location removed from any commercial establishment"; and admitted to Spencer "we" had committed a robbery.

"Faith in the ability of a jury to examine evidence critically and to apply the law impartially serves as a cornerstone of our system of criminal justice." State v. Afanador, 134 N.J. 162, 178 (1993). "Appellate intervention is warranted only to correct an injustice resulting from a plain and obvious failure of the jury to perform its function." State v. Smith, 262 N.J. Super. 487, 512 (App. Div.) (citation and

internal quotation marks omitted), <u>certif. denied</u>, 134 <u>N.J.</u> 476 (1993).  If the evidence presented allowed a rational jury to find beyond a reasonable doubt the essential elements of the crime, the court will not interfere.  <u>State v. Jackson</u>, 211 <u>N.J.</u> 394, 413-14 (2012); <u>Afanador</u>, <u>supra</u>, 134 <u>N.J.</u> at 178.

The jury was provided with defendant's testimony disputing his awareness Clemons was carrying a firearm when driving to the gas station to get some money.  The jury verdict signals its rejection of his testimony as not credible and a conclusion the significant circumstantial evidence supported defendant's knowledge Clemons was armed.  Defendant's contention the jury's verdict rested "merely upon suspicion, speculation, or conjecture or an[] overly attenuated piling of inference upon inference" is rejected.

We also find unavailing defendant's suggestion the jury charge on accomplice liability and first-degree robbery was defective.  No objection to the charge was made, requiring our examination on appeal under the plain error rule, <u>R.</u> 2:10-2. <u>State v. Torres</u>, 183 <u>N.J.</u> 554, 564 (2005).  In the context of challenges to jury charges, plain error is: "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the

error possessed a clear capacity to bring about an unjust result." State v. Hock, 54 N.J. 526, 538 (1969), cert. denied, 399 U.S. 930, 90 S. Ct. 2254, 26 L. Ed. 2d 797 (1970). "If a defendant fails to object to a trial court's instructions, the failure to challenge the jury charge is considered a waiver to object to the instruction on appeal." State v. Maloney, 216 N.J. 91, 104 (2013). However, we will reverse if the error is "clearly capable of producing an unjust result." R. 2:10-2.

Reviewing the charge as a whole, State v. Jordan, 147 N.J. 409, 422 (1997), we note the trial court charged first-degree robbery, addressing the elements of N.J.S.A. 2C:15-1(a) and (b), as well as accomplice liability, as set forth in the Model Jury Charges. Model Jury Charge (Criminal), "Liability for Another's Conduct" (1995). The charge related the elements of accomplice liability, found in N.J.S.A. 2C:2-6(c)(1)(b) (providing that one is legally accountable for the conduct of another when he or she, "[w]ith the purpose of promoting or facilitating the commission of the offense . . . [a]ids or agrees or attempts to aid such other person in planning or committing it"). Included also were the definitions of "aid" and "purposely." See

N.J.S.A. 2C:2-2(1); Model Jury Charge (Criminal), "Liability for Another's Conduct" (1995).[4]

In delivering the accomplice liability charge, the judge described the underlying crime as robbery, rather than armed robbery. Defendant contends this instruction was "fatally defective." Defendant is incorrect.

Defendant's argument asserting the crime he was accused of was "armed robbery," ignores that first-degree robbery includes conduct "if in the course of committing the theft the actor attempts to kill anyone, or purposely inflicts or attempts to inflict serious bodily injury, or is armed with, or uses or threatens the immediate use of a deadly weapon." N.J.S.A. 2C:15-1(b). The jury was told the State had to prove defendant aided Clemons, who either must have "killed [the gas station attendant] and/or [] was armed with a deadly weapon." Because defendant could be convicted under either theory, the trial court appropriately declined to refer to the offense as "armed robbery."

We reject defendant's claims this charge as delivered misstated the law or confused the jury. We conclude the charge adequately identified the applicable accomplice liability

_____

[4] The judge distributed an outline to aid the jury "[i]n order to facilitate [its] understanding of the [c]ourt's instructions with regard to robbery and felony murder . . . ."

principles and articulated the elements necessary for a conviction of first-degree robbery, explaining "[t]he State must prove it was . . . defendant's conscious object that a specific crime charged be committed."  Also, because defendant alone was on trial and no lesser-included offenses were charged, the jury would not be confused or misunderstand the accomplice liability charge regarding the first-degree robbery.

## IV.

We review the imposed thirteen-year sentence, in light of defendant's suggestion of excessiveness and his claim the judge misapplied applicable aggravating factors.  "Appellate review of the length of a sentence is limited."  State v. Miller, 205 N.J. 109, 127 (2011).  A reviewing court "does not sit to substitute its judgment for that of the trial court."  State v. O'Donnell, 117 N.J. 210, 215 (1989).  "The critical focus of the appellate power to review and correct sentences is on whether the basic sentencing determination of the lower court was 'clearly mistaken.'"  State v. Jarbath, 114 N.J. 394, 401 (1989).  Thus, appellate review of a sentencing decision requires this court consider:

> first, whether the correct sentencing guidelines, or . . . presumptions, have been followed; second, whether there is substantial evidence in the record to support the findings of fact upon which the sentencing court based the application of

35

those guidelines; and third, whether in applying those guidelines to the relevant facts the trial court erred by reaching a conclusion that could not have reasonably been made upon a weighing of the relevant factors.

[State v. Roth, 95 N.J. 334, 365-66 (1984).]

Defendant focuses his challenge on the inclusion of aggravating factor two, "[t]he gravity and seriousness of harm inflicted on the victim," N.J.S.A. 2C:44-1(a)(2). He asserts "the facts adduced at trial suggested that [d]efendant's role in th[e] incident was limited to driving the car that took Clemons to and from the scene of the crime."

The trial court considered application of the factor and recognized the seriousness of the harm that resulted from defendant's actions. The judge noted, "[t]here isn't [a harm] more serious than death." Further, he found defendant drove Clemons to and from the gas station knowing he intended to use a firearm to accomplish the robbery, and should have known a violent encounter was imminent. The judge made these additional findings:

> [T]he statute provides, including whether or not the defendant knew or reasonably should have known that the victim of the offense was particularly vulnerable or incapable of resistance. Here we have a retail gas station attendant 11 o'clock at night all alone and we have somebody who is going to get money and we know that person possesses guns. How anyone who is helping that

person, in this case [defendant], would conclude anything other than there was going to be either a very violent physical type robbery or that . . . Clemons was armed, this [c]ourt can't imagine.

[Defendant] had to know . . . Clemons was armed, that's why he stayed out of sight and let . . . Clemons do what . . . Clemons was going to do. The victim was just plain vulnerable and had no chance whatsoever . . . . Therefore, the [c]ourt finds that aggravating factor two applies.

Based on this analysis, we cannot say the judge abused his discretion.

Additional aggravating factors applied included factor three, "[t]he risk that the defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3), given defendant's pattern of previous offenses, and factor nine, "[t]he need for deterring the defendant and others from violating the law," N.J.S.A. 2C:44-1(a)(9). Unchallenged is the trial court's finding there were no mitigating factors.

Following our review, we determine the judge's conclusion the aggravating factors outweighed the non-existent mitigating factors constituted a reasonable application of the guidelines to the facts, State v. Lawless, 214 N.J. 594, 606 (2013), and properly reflected New Jersey's sentencing paradigm focusing on the offense and not the offender, State v. Hodge, 95 N.J. 369, 375 (1984). Finally, the length of the sentence was within the

first-degree range, N.J.S.A. 2C:43-6(a)(1), and does not shock our judicial conscience, State v. Ghertler, 114 N.J. 383, 393 (1989).  Our intervention is unwarranted.[5]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[5] We reject as lacking merit defendant's claim that his sentence was disparate in light of the two concurrent fifteen-year sentences imposed on Clemons following his guilty plea.  R. 2:11-3(e)(2).

A-6123-11T3