NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-4299-14T2

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

SHAWN NOWICKI, a/k/a COMELLERI
CHARLES, MCGRATH SEAN, MOREIERY
SEAN, NOWICKI SEAN, COMELLERI
CHRLES AND MORIAIRTY SEAN,

 Defendant-Appellant.
________________________________

 Submitted December 20, 2016 – Decided July 18, 2017

 Before Judges Rothstadt and Sumners.

 On appeal from Superior Court of New Jersey,
 Law Division, Ocean County, Indictment No.
 13-09-2268.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Elizabeth C. Jarit, Assistant
 Deputy Public Defender, of Counsel and on
 the brief).

 Christopher S. Porrino, Attorney General of
 New Jersey, attorney for respondent (Emily
 R. Anderson, Deputy Attorney General, of
 Counsel and on the brief).

PER CURIAM

 Defendant Shawn Nowicki appeals his conviction for second-

degree possession of a controlled dangerous substance (CDS),
oxycodone, with the intent to distribute, N.J.S.A. 2C:35-

10(a)(1). He pled guilty to the offense following the trial

court's denial of his motion to suppress evidence. Having

considered the record and applicable law, we affirm.

 I.

 We discern the following relevant facts from the

suppression hearing.1 As the search in question was warrantless,

the State sought to meet its burden to show that the search was

legal through the testimony of the Lakewood Police Officer

Christie Buble. See State v. Pineiro, 181 N.J. 13, 19 (2004).

No witnesses were presented by the defense.

 On April 29, 2013, at approximately 1:00 a.m., Buble

testified that she and fellow officer Michael Delvalle were on

foot patrol around a hotel located in a high crime area in

Lakewood Township. While walking near the outside of hotel room

"108", Buble stated she heard a female voice yell, "How am

supposed to make my $26,000 now? I'll have to sell more than

$[8000] of these pills to make some profit." The female

continued stating, "she didn't trust the male because he was

using too much of their supply, and kept berating him for being

a fucking moron and junkie." The female then spoke about "bars

1
 Defendant filed a motion to suppress the seizure of illegal
drugs, which co-defendant subsequently joined.

 2 A-Error! Reference source not found.
and 30s . . . and . . . blues[,]" which Buble explained, are

slang terms for Xanax and Oxycodone pills, respectively. At

that point, the officers had to leave the hotel parking lot to

respond to another call.

 After responding to the call, Buble and Delvalle returned

at approximately 3:30 a.m. to conduct surveillance of the hotel

from the hotel parking lot while stationed in their respective

marked police cruisers. Buble subsequently witnessed a female

exiting the hotel lobby, who matched a "Be on the look-out"

(BOLO),2 "put out from three days prior, [from] a [Lakewood]

detective . . . [who] was investigating prescription fraud at a

CVS [store.]" The BOLO was for a "white female approximately

[thirty] years old with medium length brown hair and stocky

build."

 Buble and Delvalle stopped and questioned the female, later

identified as co-defendant Tabitha Gudehus, thinking she matched

the BOLO suspect. According to Buble, Gudehus "appeared to be

very nervous, visibly shaking[,] had blue lips[,] and appeared a

little agitated." Buble stated that Gudehus was detained

because:

2
 A notification to police officers providing a physical
description of a person who allegedly assaulted a police
officer.

 3 A-Error! Reference source not found.
 At this time[,] she matched the description
 of the BOLO. As I began to talk to her[,] I
 recognized that her voice sounded like that
 of the female that was yelling outside of
 room 108. She was walking towards the
 direction of the room. It was a high crime
 area known for CDS violations. And the
 female that was wanted from the BOLO was
 also wanted for prescription drug fraud, and
 I heard the conversation in the room
 referencing prescription drug fraud.

 When Gudehus kept putting her hands into her hooded

sweatshirt pockets, despite being told not to do so, she was

subjected to a pat-down search. Buble explained that,

 [t]his was a high crime area[,] there have
 [been] multiple arrests made there for
 weapons offenses[,] . . . [Gudehus] was
 potentially the female in the BOLO that had
 previously assaulted an officer just a few
 days before[,] the area wasn’t exactly well
 lit[, a]nd the area [Gudehus] kept reaching
 in her pockets is a common area where
 weapons are placed[.]

During the pat-down on "the outside of [Gudehus's] clothes[,]"

she continued to "put her hand back into her pocket[,]" while

clenching an object in her hand. Buble then forcefully removed

Gudehus's hand from her pocket revealing that she had three

prescription pill bottles with the her name and the names of

defendant and another person printed on each bottle. The bottle

with defendant's name contained pills of different colors and

sizes that were different from and more than identified on the

prescription label.

 4 A-Error! Reference source not found.
 Buble then contacted Detective Gregg,3 who issued the BOLO

report, to determine if Gudehus was the BOLO suspect. Buble,

however, could not confirm Gudehus as the suspect and requested

her identification (ID). Gudehus replied that she left her ID

in her hotel room, so Buble and Delvalle accompanied Gudehus to

her hotel room. As the officers stood outside her hotel room

doorway, Gudehus went inside the room to get her ID from her

pocketbook. Through the unopened door, Buble observed "a male

sleeping or laying in the bed" identified in-court as defendant.

He immediately woke up, and "became very agitated and irate with

[Gudehus] for bringing [Buble and Delvalle] there." Buble

further testified that from the door, she "could see, in plain

view, four pill bottles on the nightstand[,]" while standing in

the doorway. Defendant called Buble "a pussy and told [her] to

shut the fuck up and tried to get [Gudehus's] pocketbook . . .

in order to obstruct [the officers'] investigation."

 When defendant attempted to grab Gudehus's pocketbook

again, Buble and Delvalle "entered the [hotel] room to place

[defendant] under arrest for obstruction[,]" and removed him

from the room. After viewing and sending a picture of Gudehus's

driver's license to Gregg, Buble received confirmation from

3
 The record does not mention his first name.

 5 A-Error! Reference source not found.
Gregg that Gudehus was not the BOLO suspect. The police then

asked Gudehus for permission to search the room by providing her

a "consent to search form" and advising her "that she had the

right to refuse the search at any time; that she can stop the

search at any time; and that she would be present while the

search was happening." Gudehus signed the consent form, and the

search revealed large amounts of prescription pills in four

bottles, some with torn-off labels, and one with defendant's

name on the label containing "30-milligram Oxycodone pills".

Gudehus was arrested following the search.4

 The motion judge reserved decision, and issued orders and a

single written decision on July 29, 2014, denying defendant's

and Gudehus's motions to suppress. In denying defendant's

motion, the judge rejected the contention that Buble had no

reasonable suspicion for detaining Gudehus, and that Buble

exceeded the scope of the pat down search of Gudehus after it

was apparent that Gudehus had no weapons. The judge found that

4
 Defendant and Gudehus were jointly charged with third-degree
possession of Oxycodone, N.J.S.A 2C:35-10(b)(4), second-degree
possession of Oxycodone with intent to distribute, N.J.S.A.
2C:35-5(b)(4), third-degree possession of Buprenorphine, N.J.S.A
2C:35-10(a)(1), third-degree possession of Diazepam, N.J.S.A
2C:35-10(a)(1), third-degree possession of Carisoprodol, N.J.S.A
2C:35-10(a)(1), and third-degree possession of Alprazolam,
N.J.S.A 2C:35-10(a)(1). In addition, defendant was individually
charged with fourth-degree obstruction, N.J.S.A. 2C:29-1.

 6 A-Error! Reference source not found.
under the totality of circumstances, there was reasonable

suspicion to detain Gudehus and confirm her identification

because she appeared to match the BOLO suspect description. In

particular, the judge noted that Gudehus "appeared slightly

disoriented and had blue-colored lips[,]" it was a high-crime

area, she continued to reach into her pockets, despite being

advised not to do so, she was "visibly nervous, her body was

shaking, and she would not make eye contact with the officers."

The judge found that Buble's pat-down was proper under State v.

Lund, 119 N.J. 35, 48 (1990), because based on Buble's training

it became "immediately apparent" that Gudehus had contraband.

 Next, the motion judge found no merit in defendant's

argument that the police were unreasonable to investigate

further once they found contraband on Gudehus. The judge

reasoned that "[i]t was objectively reasonable for [the]

officers to request identification from [Gudehus]" because she

only provided her first name, the officers needed to dispel

their suspicion that she was not the BOLO suspect, and it was

routine for officers to request ID to ensure that Gudehus had no

active warrants out for her arrest. Consequently, the judge

determined that Buble and Delvalle had a legitimate reason to go

with Gudehus to her hotel room so that she could obtain her ID.

 7 A-Error! Reference source not found.
 The motion judge also rejected defendant's argument that

the search was unlawful because defendant had a reasonable

expectation of privacy in the hotel room, and did not consent to

the search. The judge determined that, as a "guest," defendant

did not have a reasonable expectation of privacy. Nevertheless,

assuming defendant had a reasonable expectation of privacy, the

judge found that the search of the hotel room did not offend

defendant's right to privacy because Gudehus's consent was

justified by the third party exception. Citing State v.

Douglas, 204 N.J. Super. 265, 277 (App. Div. 1985), the judge

found that Gudehus had the right to control access to the hotel

room because the she paid for and registered the room in her

name. Moreover, the judge noted that once the officers noticed

the prescription pill bottles on the nightstand, Gudehus

voluntarily and without coercion consented to search the room.

 Defendant subsequently pled guilty to second-degree

possession of oxycodone with intent to distribute and resolved

three other indictments, and was sentenced to an aggregate

prison term of eight years with a forty-month period of parole

ineligibility. This appeal followed.

 II.

 Defendant raises the following single-point argument for

our consideration:

 8 A-Error! Reference source not found.
 THE TRIAL COURT ERRED IN DENYING THE MOTION
 TO SUPPRESS BECAUSE THE POLICE LACKED
 REASONABLE SUSPICION TO CONDUCT THE STOP,
 AND BECAUSE THE POLICE EXCEEDED THE SCOPE OF
 THE INVESTIGATORY STOP BY SEIZING AND
 EXAMINING THE PRESCRIPTION PILL BOTTLES AND
 BY ACCOMPANYING THE CO-DEFENDANT TO HER ROOM
 TO RETRIEVE HER IDENTIFICATION.5

 In our consideration of a trial court's ruling on a motion

to suppress evidence, "[w]e conduct [our] review with

substantial deference to the trial court's factual findings,

which we 'must uphold . . . so long as those findings are

supported by sufficient credible evidence in the record.'"

State v. Hinton, 216 N.J. 211, 228 (2013) (quoting State v.

Handy, 206 N.J. 39, 44 (2011)). "When . . . we consider a

ruling that applies legal principles to the factual findings of

the trial court, we defer to those findings but review de novo

the application of those principles to the factual findings."

Ibid. (citing State v. Harris, 181 N.J. 391, 416 (2004), cert.

denied, 545 U.S. 1145, 125 S. Ct. 2973, 162 L. Ed. 2d 898

(2005)). However, despite our deferential standard, "if the

trial court's findings are so clearly mistaken 'that the

interests of justice demand intervention and correction,' then

the appellate court should review 'the record as if it were

deciding the matter at inception and make its own findings and

5
 We have omitted the sub-points in defendant's brief.

 9 A-Error! Reference source not found.
conclusions.'" State v. Mann, 203 N.J. 328, 337 (2010) (quoting

State v. Johnson, 42 N.J. 146, 162 (1964)).

 Both the United States and New Jersey Constitutions protect

individuals against unreasonable searches and seizures. U.S.

Const. amend. IV; N.J. Const. art. I, ¶ 7. Under the

exclusionary rule, evidence obtained in violation of an

individual's constitutional rights will be excluded as "fruit of

the poisonous tree." State v. Faucette, 439 N.J. Super. 241,

266 (App. Div.), certif. denied, 221 N.J. 492 (2015).

Because the search at issue was executed without a warrant, it

is presumed facially invalid; to overcome this presumption, the

State must show that the search falls within one of the well-

recognized exceptions to the warrant requirement and there

exists probable cause. State v. Moore, 181 N.J. 40, 44 (2004);

State v. Valencia, 93 N.J. 126, 133 (1983). One such exception

is found in the plain-view doctrine.6 The State bears the burden

6
 For the plain view exception to apply, the State must prove
that

 (1) the officer was "lawfully in the viewing
 area," (2) the officer discovered the
 evidence "'inadvertently,' meaning that he
 did not know in advance where the evidence
 was located nor intend beforehand to seize
 it," and (3) it was "immediately apparent"
 that the items "were evidence of a crime,
 contraband, or otherwise subject to
 seizure."
 (continued)

 10 A-Error! Reference source not found.
of demonstrating that the seizure was legal. Valencia, supra,

93 N.J. at 133.

 An investigative stop, or a Terry stop, allows police to

"detain an individual temporarily for questioning." State v.

Maryland, 167 N.J. 471, 486 (2001) (citing Terry v. Ohio, 392

U.S. 1, 22, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889, 906 (1968)).

To justify an investigative stop, the police must have "a

'particularized suspicion' based upon an objective observation

that the person stopped has been or is about to engage in

criminal wrongdoing." State v. Davis, 104 N.J. 490, 504 (1986).

Additionally, "[t]he 'articulable reasons' or 'particularized

suspicion' of criminal activity must be based upon the law

enforcement officer's assessment of the totality of

circumstances . . . ." Ibid. "Reasonable suspicion necessary

to justify an investigatory stop is a lower standard than the

(continued)

 [State v. Earls, 214 N.J. 564, 592 (2013)
 (quoting Mann, supra, 203 N.J. at 341).]

In State v. Gonzales, 227 N.J. 77 (2016), our Supreme Court held
prospectively "that an inadvertent discovery of contraband or
evidence of a crime is no longer a predicate for a plain view
seizure." Id. at 82. This suppression motion pre-dated
Gonzales, and therefore the element must be satisfied in this
case.

 11 A-Error! Reference source not found.
probable cause necessary to sustain an arrest." State v.

Stovall, 170 N.J. 346, 356 (2002) (citing State v. Citarella,

154 N.J. 272, 279 (1998)).

 We evaluate the "totality of the circumstances surrounding

the police-citizen encounter" when determining the

reasonableness of the stop. State v. Privott, 203 N.J. 16, 25-

26 (2010) (quoting Davis, supra, 104 N.J. at 504). We consider

"a police officer's 'common and specialized experience,' and

evidence concerning the high-crime reputation of an area."

Moore, supra, 181 N.J. at 46 (citations omitted). While a high

crime area alone is not a sufficient basis to justify the stop,

"the location of the investigatory stop can reasonably elevate a

police officer's suspicion that a suspect is armed." State v.

Valentine, 134 N.J. 536, 547 (1994).

 We begin by noting there is no dispute that Gudehus

voluntarily signed a written consent-to-search form to allow the

search of the hotel room registered in her name.7 Defendant,

7
 The fact that the search in question occurred in a motel room
is of no consequence. While "the reasonable privacy
expectations in a hotel room differ from those in a
residence[,]" United States v. Agapito, 620 F.2d 324, 331 (2d
Cir.), cert. denied, 449 U.S. 834, 101 S. Ct. 107, 66 L. Ed. 2d
40 (1980), occupants of a hotel room are nevertheless entitled
to the protection of the Fourth Amendment. See Hoffa v. United
States, 385 U.S. 293, 301, 87 S. Ct. 408, 413, 17 L. Ed. 2d 374,
381 (1966); State v. Alvarez, 238 N.J. Super. 560, 571 (App.
Div. 1990). "Under our constitutional jurisprudence, when it is
 (continued)

 12 A-Error! Reference source not found.
however, contends that, by virtue of fruit-of-the-poisonous-tree

doctrine, evidence of his possession of a CDS was unlawfully

obtained from the unlawful stop, search and seizure, and

detention conducted on Gudehus. We disagree.

 Here, the police officers were conducting an investigatory

stop based upon several articulable and objective facts.

Gudehus was in a high crime area and sounded like the female

that the police had heard earlier that evening in the same

vicinity who was discussing the plan to make illegal sales of

prescription drugs. When stopped, Gudehus was nervous, shaking,

and agitated. Moreover, she appeared to match the description

of a BOLO suspect involved with prescription drug fraud.

Because she refused the officers' command to stop putting her

hands in her pockets due to the concern that she was concealing

a weapon, a pat-down search was conducted. Finding that she was

in possession of drugs prescribed to three individuals, the

officers properly requested proof of her identification. When

she responded that she had to retrieve her ID from her hotel

room, the officers followed her to her room. Notably, the

(continued)
practicable to do so, the police are generally required to
secure a warrant before conducting a search of certain places,
. . . such as a hotel room." State v. Hathaway, 222 N.J. 453,
468 (2015).

 13 A-Error! Reference source not found.
officers did not enter the room until defendant became agitated

and intervened by trying to prevent her from getting her ID.

Gudehus's ensuing written consent to search the room when other

prescription drugs were seen in plain view resulted in the

seizure of evidence that consequently led to defendant's plea.

Thus, we conclude, as did the motion judge, that the motion to

suppress should be denied as the totality of the circumstances

justified the investigative stop, which led to a plain view

observation of illegal prescription drugs and a consent to

search.

 Affirmed.

 14 A-Error! Reference source not found.