**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2891-17T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ZACHARY D. FLOWERS,

     Defendant-Appellant.

_____

Submitted May 12, 2020 – Decided June 15, 2020

Before Judges Fisher and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Warren County, Indictment No. 15-12-0563.

Joseph E. Krakora, Public Defender, attorney for appellant (Kevin G. Byrnes, Designated Counsel, on the briefs).

Richard T. Burke, Warren County Prosecutor, attorney for respondent (Dit Mosco, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Tried to a jury, defendant Zachary D. Flowers was convicted of felony-murder, armed robbery, conspiracy to commit robbery, and related weapons offenses for his involvement in the shooting death of a gas station attendant. Defendant was sentenced to an aggregate thirty-five-year prison term; he must serve eighty-five percent of that term under the No Early Release Act, N.J.S.A. 2C:43-7.2. During the nine-day trial, the State presented the testimony of twenty-five witnesses. But the case turned on defendant's words: six days after the shooting, defendant gave a detailed confession to police; at trial defendant recanted his post-arrest admissions, claiming they were a contrived attempt to protect his friend, David Beagell. Evidence seized from defendant's home corroborated the statement he gave to police; the prosecutor referenced that evidence in his closing remarks.

Defendant now appeals, arguing:

POINT I

[]DEFENDANT'S RIGHTS WERE VIOLATED BY THE PROSECUTOR'S USE AND RELIANCE ON . . . DEFENDANT'S MOTHER'S STATEMENT MADE DURING THE COURSE OF A POLICE INVESTIGATION IMPLICATING . . . DEFENDANT IN THE CRIME OF MURDER, EVEN THOUGH DEFENDANT'S MOTHER DID NOT TESTIFY.

A. []Defendant's Right of Confrontation Was Violated.

2

B.   Putting Highly Prejudicial and Incriminating Hearsay Statements before the Jurors in the Guise of Cross-Examination Constitutes Egregious Prosecutorial Misconduct.

## POINT II

[]DEFENDANT WAS DENIED THE RIGHT TO PRESENT A COMPLETE DEFENSE WHEN STATE WITNESSES VIOLATED THE SEQUESTRATION ORDER, UNDERMINING COUNSEL'S ABILITY TO IMPEACH THEM BASED ON INCONSISTENCIES.

## POINT III

THE VIDEO RECORDING OF DEFENDANT'S STATEMENT SHOULD HAVE BEEN EXCLUDED BECAUSE IT WAS "INDISCERNIBLE."
(Not raised below)

## POINT IV

THE STATE FAILED TO PROVE THAT THE WARRANTLESS SEARCH OF . . . DEFENDANT'S BEDROOM WAS LAWFULLY AUTHORIZED BY A THIRD[-]PARTY CONSENT SEARCH.

## POINT V

THE STATE FAILED TO PROVE THAT THE CONFESSION WAS GIVEN VOLUNTARILY AND KNOWINGLY.

## POINT VI

THE SENTENCE IS EXCESSIVE.

A-2891-17T1

We reject the arguments challenging defendant's convictions, subject to a remand for an evidentiary hearing on his motion to suppress evidence, and we remand for resentencing without consideration of aggravating factor one, N.J.S.A. 2C:44-1(a)(1). In doing so, we find insufficient merit in the arguments raised in points II, III, and V to warrant extended discussion in a written opinion, R. 2:11-3(e)(2), beyond the comments that follow. We focus instead on points I, IV, and VI.

I.

Soon after midnight on January 5, 2012, police were dispatched to the BP gas station in Phillipsburg, following a report that the attendant was lying on the ground bleeding. Upon their arrival, officers saw Kismathdas Kasam lying in a pool of blood. Kasam was unconscious with a gunshot wound to his right leg. A shotgun-style ammunition "wad" lay on the ground nearby. Kasam's wedding band was removed, cash was missing from the booth, and the wires leading to the surveillance camera were severed. Medical efforts to save Kasam – including amputation of his leg – were made in vain; Kasam died from the gunshot wound two days later.

No one witnessed the crime, but police had some leads, including a neighbor's description of two men she saw running from the scene. She told

police the second man was carrying a shotgun. A police artist drew composite sketches of the suspects based on her descriptions, but police never asked the neighbor to identify a photograph of any suspects.

Within days of the incident, the police tip line also proved fruitful: a caller told police defendant admitted to the caller's sister, Sara Warfle, and her boyfriend, Jeremy Reed, that defendant was involved in the robbery. According to Warfle's trial testimony, defendant called Reed, sounding "upset" and asked whether he could come to Reed's home. When defendant arrived, he spoke with Warfle and Reed together, and told them that he and Andy Torres went to the BP gas station in Phillipsburg, intending to rob it; Torres went behind the building and cut the wires to the surveillance system; Torres and the attendant got into an argument; Torres shot the attendant in the leg with a shotgun; they took money, then ran from the scene. Defendant also said Alexis Flowers[1] – defendant's sister and Torres's girlfriend – drove them from the scene. Warfle did not recall defendant mentioning Beagell was involved in the incident. Reed

---

[1] Alexis, Torres, and Beagell were charged and convicted for their participation in the incident; they did not testify against defendant at his trial; their judgments of conviction were not provided to us on this appeal. We upheld Torres's convictions following a jury trial before another judge, but remanded for resentencing. See State v. Torres, No. A-2626-15 (App. Div. Mar. 4, 2019) (slip op. at 1-32), certif. denied, 239 N.J. 259 (2019).

essentially corroborated Warfle's testimony, adding defendant said Beagell was with them.

Shortly after his conversation with defendant, Reed agreed to participate in police-monitored text message communications with defendant. During their exchange of several messages about the ongoing police investigation, Reed told defendant print and television media had released sketches of the suspects. In response to defendant's inquiry, Reed messaged defendant that one of the sketches resembled defendant's "skin color, and his height, and everything looked like him." Defendant instructed Reed to "erase all our messages." Defendant thereafter messaged Reed:

> Yeah, we're all good though. We were well equipped, completely covered, mask, hoods, gloves, we were ready for it. They don't got shit. None of those witnesses would be credible in court. But we took out the video surveillance an hour earlier so, yeah, I'm good. Have faith in me.

On January 11, detectives assigned to the Warren County Prosecutor's Office and the Allentown Police Department arrested Torres on an active warrant, and seized a shotgun from the home he shared with Alexis in Allentown, Pennsylvania. Detectives questioned Torres, Alexis and defendant,

who implicated themselves, one another, and Beagell[2] in the incident.

Police also questioned Michelle Flowers, the mother of defendant and Alexis, after learning her car was involved in the incident. Pertinent to this appeal, Michelle told police defendant said "he was going down" for his participation in the robbery, explaining: "he was crossing the street, he had the money, he was running or whatever, and he turned back and saw [Kasam] fall to the ground." Defendant told Michelle, "I can never go in the military now." Michelle did not testify at defendant's trial.

After waiving his Miranda[3] rights, defendant gave two detailed statements to police, totaling nearly two hours in duration. Defendant initially told police he planned the robbery with Torres and Alexis, then later acknowledged Beagell "unwillingly" went along for the ride. Defendant claimed Beagell was unaware Torres intended to bring his shotgun to the gas station; Beagell thought they would be using defendant's BB gun, baton and taser. Defendant vehemently denied Beagell was the shooter.

Defendant's video-recorded statements were played for the jury during the State's case-in-chief. Defendant testified on his own behalf and recanted his

---

[2] Beagell was arrested two weeks later. Torres, slip op. at 3.

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

pre-trial admissions. He told the jury he lied to police because he was trying to protect Beagell, whose role defendant said he assumed when he confessed to Warfle, Reed, and the detectives.

Defendant testified that a few days after the incident, Beagell said he participated in the robbery with Torres and Alexis and acknowledged Kasam had been shot. Beagell "bugged" defendant to help him, so defendant agreed to "take his role and make a story about how [defendant] was involved and [Beagell] wasn't." Defendant said he practiced his story on Warfle and Reed, finding it funny "to portray" himself to his friends in "a gangster kind of role." Defendant claimed the lies he told to police were based on the details of the robbery provided to him by Torres, Beagell, and Alexis, which he "was able to coalesce into a story and then some of the stuff that [he] didn't know" he "winged it with mixing in fact and fiction."

The jury deliberated for one day – including playback of defendant's post-arrest statements – and returned a guilty verdict on all counts, except unlawful possession of the BB gun. Following defendant's sentence, he filed this appeal.

II.

A warrantless search of defendant's bedroom resulted in the seizure of his BB gun and baton, which corroborated his confession to police. Defendant and

A-2891-17T1

his two younger siblings lived in the home, which was located in Allentown and owned by Michelle. Beagell and his girlfriend, Kirsten Piscitello, rented a bedroom in the residence.

In point IV of his merits brief, defendant primarily argues the State failed to satisfy its burden of proving the warrantless search of his bedroom was lawful, and the trial court impermissibly shifted the burden to defendant to demonstrate Michelle was not authorized to consent to the search of his room. Defendant seeks reversal and a new trial; he does not argue the court should have held an evidentiary hearing. Citing Pennsylvania case law, the State maintains "there was absolutely no evidence presented" to counter Michelle's apparent authority to grant consent. For the first time on appeal, the State alternatively argues the seizure was authorized under the inevitable discovery doctrine.[4] Because it appears from the record that issues of fact precluded a decision based only on the submissions of the parties and oral argument, we remand for a testimonial hearing.

---

[4] Because the State did not advance the inevitable discovery exception to the warrant requirement before the trial court, and we are remanding for a hearing only as to the third-party consent exception, we decline to consider the State's alternate argument on appeal. State v. Robinson, 200 N.J. 1, 20 (2009).

In reviewing a suppression ruling, we are mindful we must uphold a trial court's factual findings, "regardless of whether the evidence is live testimony, a videotaped statement, or documentary evidence" if they are supported by sufficient credible evidence in the record. State v. S.N., 231 N.J. 497, 514 (2018) (citing State v. S.S., 229 N.J. 360, 379 (2017)). "We accord no deference, however, to a trial court's interpretation of law, which we review de novo." State v. Dunbar, 229 N.J. 521, 539 (2017).

In this case, however, no evidence was admitted at the hearing, which was limited to oral argument following submission of the parties' briefs. Neither party has supplied us with the motion and supporting or opposing papers that were filed.[5] As a result, we rely on the transcript of the proceedings and the court's written decision, which summarized the parties' factual and legal positions. Notably, there is no indication in the court's decision that the parties stipulated to any facts concerning the search.

During oral argument, defense counsel framed the "crux of [his] argument" as law enforcement's "awareness" and "knowledge" that Michelle's home was not "a typical family situation" because Beagell and Piscitello rented a bedroom in the home and police obtained consent from Piscitello before

---

[5] Nor was the consent form signed by Michelle included on appeal.

searching the Beagell-Piscitello bedroom. Counsel argued Michelle's residence was more akin to a rooming house than a family home and, as such, police needed defendant's consent to search his bedroom. Counsel vacillated as to whether an evidentiary hearing was necessary, eventually arguing: "I think it would be impossible to deny . . . defendant's motion without . . . testimony and without the police successfully trying to explain why" they requested consent from Piscitello and not defendant "because what they did was seemingly unconstitutional on its face."

In response, the prosecutor argued there were no material facts in dispute to warrant a hearing. He asserted defendant did not dispute Michelle owned the residence; was present when police entered the home; and "never stopped the consent." The prosecutor told the court defendant did not dispute Beagell and Piscitello paid rent to Michelle, adding: "And we know [defendant] was not [paying rent]."

The prosecutor continued:

> [T]here are no facts that have been given to Your Honor to give any indication that [defendant] was paying rent, that the door was locked, that his mother had no access to that room, no one else had any access to that room but [defendant], and in the absence of those facts the law of Pennsylvania indicates that Michelle Flowers had the apparent authority and the right to grant consent [to a search] of that residence.

11

The prosecutor further argued defense counsel failed to provide an affidavit from Michelle or defendant disputing the State's facts. According to the prosecutor, the motion was filed as a legal argument and "we're not taking testimony regardless."

Following argument, the trial court issued a written decision, initially finding "the outcome is the same whether applying New Jersey or Pennsylvania law."[6] The judge noted the absence of any evidence in the record that "defendant was paying rent thereby giving him a legal expectation of privacy in his room." Distinguishing the familial relationship between defendant and Michelle on the one hand, and the landlord-tenant relationship among Michelle, Beagell and Piscitello on the other, the court found "defendant is Michelle Flowers' son who lives in her home and he does not pay rent. Accordingly, under New Jersey law, Mrs. Flowers may validly consent to the search of . . . defendant's room in the home that she owns." Citing New Jersey case law, the court elaborated:

> There was no evidence proffered that . . . defendant had previously objected to the search of his room, had a lock on his room or any indication that his mother did not possess common authority over the room in the

---

[6] It appears the parties' trial briefs addressed whether New Jersey or Pennsylvania law applied to the search of Michelle's home, located in Allentown. At oral argument before the trial court, defense counsel seemingly conceded Pennsylvania law governed; on appeal defendant argues New Jersey law applies.

home. Additionally, given the facts presented to this [c]ourt the officers had a reasonable belief that . . . Michelle Flowers had sufficient control over the property to consent to its being searched, as she was the owner of the home. As such, Michelle Flowers was able to validly consent to the search of . . . defendant's room and the police did not need to either obtain a search warrant or obtain consent from . . . defendant himself.

Surveying Pennsylvania third-party consent law, the court reached the same conclusion.

But in reaching its decision, the trial court observed defendant "adopt[ed] the State's [s]tatement of facts with the exceptions/additions," which the court summarized as the State's:

- failure to set forth whether police asked Michelle "about the details of [defendant's] living arrangements";

- knowledge that defendant was an adult at the time of the search but police failed to ask Michelle whether there were "any rental arrangements" regarding defendant's room;

- action in seeking consent from Piscitello for the room occupied by her and Beagell, but police did not similarly attempt to ask defendant for consent for his room;

- failure to ask Michelle "specifically if she had the right of entry into the room rented by the defendant; and what her consent encompassed"; and

13

- failure to cite "exigent circumstances that would have prevented the State from waiting to search . . . defendant's separately occupied room until [it] had either secured consent from [Michelle], as [it] did with . . . Piscitello, or obtained a warrant.

It appears from the trial court's summary of defendant's "exceptions" and "additions" to the factual statement set forth in the State's brief that defendant raised issues of material fact concerning Michelle's authority to consent to a search of his bedroom. Accordingly, a testimonial hearing was necessary. See R. 3:5-7(c) (mandating a testimonial suppression hearing when material facts are in dispute); State v. Parker, 459 N.J. Super. 26, 30 (2019); State v. Green, 346 N.J. Super. 87, 90 (App. Div. 2001). As the Court has reaffirmed, an evidentiary hearing is "[t]he proper mechanism through which to explore the constitutionality of warrantless police conduct . . . ." State v. Atwood, 232 N.J. 433, 445 (2018) (citing N.J.R.E. 104; State v. Gamble, 218 N.J. 412, 419 (2014)). "At evidentiary hearings, the State presents witnesses to substantiate its basis for the challenged warrantless conduct, and the defense is afforded the opportunity to confront and cross-examine the State's witnesses." Ibid.

Notably, the Rule "does not require defendants to file an affidavit in order to be entitled to a hearing on a motion to suppress evidence obtained as a result of a warrantless search." State v. Torres, 154 N.J. Super. 169, 173 (App. Div.

1977).  But the defendant's counter-statement of facts must assert more than "[t]he mere allegation of a warrantless search, with the attendant burden of proof on the State to justify same," or mere denial of "the truth of the State's allegations."  Green, 346 N.J. Super. at 91.

Applying those principles here, we are satisfied defendant's counter-statement of facts went further than requiring the State to justify the search or merely denying "the truth of the State's allegations," despite counsel's late request during oral argument.  In reaching our decision, we agree with the trial court, that the analysis regarding third-party consent searches is essentially the same under the law of our State and Pennsylvania, as indicated below.  We therefore need not engage in a choice of law analysis.  See State v. Minter, 116 N.J. 269, 279 (1989) (noting a choice-of-law analysis is necessary where the search and seizure rules of the forum jurisdiction differ from the situs of the search or seizure).

"Warrantless seizures and searches are presumptively invalid as contrary to the United States and the New Jersey Constitutions."  State v. Pineiro, 181 N.J. 13, 19 (2004).  The same is true under Article I, Section 8 of the Pennsylvania Constitution.  Commonwealth v. Caple, 121 A.3d 511, 517 (Pa. Super. 2015).  To overcome this presumption, the State must show by a

preponderance of evidence that the search falls within one of the well-recognized exceptions to the warrant requirement. State v. Bryant, 227 N.J. 60, 69-70 (2016). Pennsylvania law is in accord. Caple, 121 A.3d at 517. The warrant requirement "is not lightly to be dispensed with, and the burden is on the State, as the party seeking to validate a warrantless search, to bring it within one of those recognized exceptions." State v. Alston, 88 N.J. 211, 230 (1981). Pennsylvania places the same burden on the Commonwealth. In the Interest of L.G., 79 A.3d 1073, 1086 (Pa. 2013) (recognizing "regardless of whether the defendant's suppression motion is detailed or boilerplate, the Commonwealth carries the burden at suppression and satisfies that burden if it proves to the satisfaction of the suppression court that the evidence was properly seized"). Both States recognize a consent search as a well-established exception to the warrant requirement. See State v. Coles, 218 N.J. 322, 337 (2014); Commonwealth v. Romero, 183 A.3d 364, 398 (Pa. 2018).

Our Supreme Court has recognized a parent's authority to consent to the search of an adult child's bedroom is a question "of objective reasonableness based on an assessment of the totality of the circumstances." Coles, 218 N.J. at 341. In making that assessment, courts may consider "whether a child has exclusive possession of his or her room, such as whether the child pays rent;

16

whether the parent has access to the child's room for cleaning or other such general access purposes; and whether the child has the right to lock the door to deny access." Ibid.; see also State v. Crumb, 307 N.J. Super. 204, 245 (App. Div. 1997).

Similarly, Pennsylvania courts have recognized: "Overt indications of privacy expectation are not necessary in a strict landlord-tenant relationship because the expectation is understood by society. But cases dealing with search and seizure in a family setting emphasize the need for overt indications." Commonwealth v. Lowery, 451 A.2d 245, 247 (Pa. Super. 1982). Pennyslvania courts have ackowledged "with certain exceptions, a parent has the authority to consent to a search of his child's quarters in the parent's home." Id. at 247-48. The court in Lowery noted the expectation was manifested where a nineteen-year-old man "locked his bedroom and an adjoining kitchenette, and told his mother not to enter nor to allow anyone else to enter." Id. at 248 (citations omitted).

During oral argument the prosecutor argued certain facts – such as, defendant did not pay rent to Michelle – were established in the record. As defendant correctly countered, however, the parties and the court may have been aware of details about the case, but absent testimony, the facts were not

contained in the record. A reviewing court, "may only consider whether the motion to suppress was properly decided based on the evidence presented at that time." State v. Gibson, 318 N.J. Super. 1, 9 (App. Div. 1999).

While we recognize, and do not countenance, defendant's failure to request a testimonial hearing prior to oral argument, it nonetheless appears he asserted sufficient questions of fact in his brief's counter-statement and during argument to warrant a testimonial hearing. We further observe all the authority cited by the trial court – and the State on appeal – address decisions of motion judges, in this State and Pennsylvania, after a testimonial hearing had been conducted. See, e.g., State v. Lamb, 218 N.J. 300, 318 (2014); State v. Suazo, 133 N.J. 315, 320 (1993); Crumb, 307 N.J. Super. at 242; State v. Douglas, 204 N.J. Super. 265, 280 (App. Div. 1985); Commonwealth v. Basking, 970 A.2d 1181, 1191-92 (Pa. 2009); Commonwealth v. Hunter, 963 A.2d 545, 552-53 (Pa. 2008); Commonwealth v. Simmen, 58 A.3d 811, 814 (Pa. Super 2012); Lowery, 451 A.2d at 247-48.

In sum, the detectives who executed the search may have reasonably believed Michelle had authority to consent to search defendant's bedroom, Coles, 218 N.J. at 341, but their reasons are not apparent from the record. We are therefore satisfied the appropriate remedy here is to remand the matter for a

testimonial hearing. Following the hearing, should the trial court determine the State failed to prove the necessary elements of a valid consent search, the BB gun and baton seized from defendant's bedroom shall be suppressed and a new trial granted. If, however, valid consent is established, we affirm defendant's conviction, but remand for reconsideration of sentence for the reasons that follow in Section VII below.

### III.

In point I of his brief, defendant claims his right of confrontation was violated when the prosecutor cross-examined him about the admissions he made to his mother, who did not testify at trial. Defendant challenges the following inquiry:

> PROSECUTOR: Besides this [sic] alleged conversations you had with David Beagell and Andy Torres and Alexis Flowers that you say provided you with the details of what happened because you weren't there --
>
> ANSWER: Uh-huh.
>
> PROSECUTOR: -- you also had a conversation with your mother about what took place that evening. Didn't you?
>
> ANSWER: Not really. I wouldn't call it a conversation.
>
> PROSECUTOR: Well, you've seen the discovery in this case correct?

ANSWER:  Correct.

PROSECUTOR:  You know your mother gave a statement --

DEFENSE COUNSEL:  Objection.  Not in evidence.

THE COURT:  Not in evidence.

PROSECUTOR:  It doesn't matter, Judge.

THE COURT:  Overruled. Sidebar.

At the ensuing sidebar, the prosecutor acknowledged Michelle's statement was not in evidence, but indicated he intended to ask defendant what Michelle said and "whether that was true or not."  The judge overruled defense counsel's continued objection, noting the prosecutor "can certainly [say], would it surprise you if your mother said such and such."  (Emphasis added).

Over defense counsel's continued objection, the prosecutor continued:

PROSECUTOR:  Mr. Flowers, you did have . . . at least one conversation with your mother about what took place that evening.  Did you not?

DEFENDANT:  Uh-huh.

PROSECUTOR:  Yes?

DEFENDANT:  Yes.

PROSECUTOR:  And . . . would it surprise you that your mother said that you told her you were involved and that you felt shitty about it and that it was going to

ruin your chance to go in the military? Would it surprise you that she said that?

DEFENDANT: Yeah. I wasn't there for her statement.

PROSECUTOR: But, does it surprise you that --

DEFENDANT: I just said, yes.

PROSECUTOR: -- okay. So, that never happened? You never had that conversation with your mother?

DEFENDANT: I just told you a minute ago I had a conversation with my mother.

PROSECUTOR: But, you never told your mother that you were involved or that you felt shitty about it --

DEFENDANT: No.

PROSECUTOR: -- or that it wouldn't get you in the military?

DEFENDANT: No.

PROSECUTOR: All right. So, she's lying when she told us that?

[(Emphasis added).]

The court sustained defendant's timely objection to the prosecutor's final question in that line of inquiry and instructed the jury to "disregard the last statement by the prosecutor." Defendant did not answer the question. The prosecutor continued to poke holes in defendant's recantation, including: why

defendant would instruct Reed to erase their messages if defendant were only "role playing"; why defendant would exonerate Beagell, whom he knew only for a few months, yet implicate his sister in felony murder charges; how defendant was able to provide details about the shotgun, which matched the gun police seized from Torres's home; and how Beagell was under the impression defendant's BB gun, baton and taser would be used in the robbery.

At the conclusion of the prosecutor's cross-examination – which spanned more than twenty transcript pages, excluding the questions at issue – defense counsel again "strenuously" objected to the prosecutor's questions concerning defendant's statements to his mother, arguing the State "in effect put[] into evidence that [defendant] told his mother he committed the crime." The next trial day, during the final charge conference, defense counsel reiterated his objection, requesting a mistrial. The court denied the motion, informing counsel he would issue a curative instruction during its final charge, which would "not be bolded" but would be included "just like any other part of the instructions."

Ordinarily, the scope of cross-examination is a matter addressed to the trial judge's discretion. State v. Murray, 240 N.J. Super. 378, 394 (App. Div. 1990). We will interfere, however, when "clear error and prejudice are shown." Ibid.

Criminal defendants have the constitutional right to confront the witnesses against them. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10; State v. Branch, 182 N.J. 338, 348 (2005). "The opportunity to cross-examine a witness is at the very core of the right of confrontation." State v. Cabbell, 207 N.J. 311, 328 (2011). The Confrontation Clause generally prohibits the use of an out-of-court testimonial hearsay statement unless the person who made the statement is unavailable to testify at trial, and the defendant had a prior opportunity for cross-examination. Id. at 329-30 (citing Crawford v. Washington, 541 U.S. 36, 59 (2004)). "A statement about a relevant past event made to a police officer conducting a criminal investigation meets the Sixth Amendment's formality and solemnity requirement for a testimonial statement." State v. Basil, 202 N.J. 570, 592 (2010).

Defendant testified at trial, placing his credibility squarely in issue. He recanted his pre-arrest statements to Reed and Warfle and his post-arrest statements to police, requiring the jury to determine which version rang true. Obviously, the prosecutor sought to discredit defendant's belated story. In that regard, he was entitled to impeach defendant's credibility by questioning him about admissions he made to anyone, including his mother. See N.J.R.E. 803(c)(25) (recognizing a statement against interest as an exception to the

hearsay rule); State v. White, 158 N.J. 230, 238 (1999). But the prosecutor's questioning went further than permissibly asking whether defendant made certain admissions to his mother regarding his "involve[ment]" in the incident.

Because Michelle did not testify at trial, the prosecutor impermissibly asked defendant, "would it surprise you that your mother said that you told her you were involved . . . ." (Emphasis added). Michelle's out-of-court statements to police about defendant's statements to her clearly were inadmissible hearsay under N.J.R.E. 802, and violated the Confrontation Clause. Functionally, the prosecutor's inquiry of defendant about what Michelle told police was a backdoor means of improperly eliciting Michelle's hearsay statement.[7] Cf. Murray, 240 N.J. Super. at 394-95.

---

[7] Compounding the error, the prosecutor then asked defendant whether his mother was lying when she gave her statement to police about his admissions. It is well settled that "the mere assessment of another witness's credibility is prohibited." State v. Frisby, 174 N.J. 583, 594 (2002). The trial court correctly and immediately sustained defense counsel's objection at trial; defendant does not challenge the court's ruling or the prosecutor's remark on appeal; and for the reasons that follow, we conclude the prosecutor's entire line of inquiry was harmless error. We nonetheless take this opportunity to remind the State of its obligation to conduct cross-examination within the bounds of our jurisprudence. Indeed, "New Jersey courts have commented repeatedly on the special role filled by those entrusted with the responsibility to represent the State in criminal matters, observing that the primary duty of a prosecutor is not to obtain convictions but to see that justice is done." State v. Smith, 212 N.J. 365, 402-03 (2012).

Nor are we persuaded that the trial court's instruction cured the prosecutor's error. Although the Supreme Court has recognized, "[w]hen inadmissible evidence is admitted in error by the trial court, a curative instruction may sometimes be a sufficient remedy," State v. Prall, 231 N.J. 567, 586 (2018), the Court also has cautioned a curative instruction generally "must be firm, clear, and accomplished without delay" to alleviate potential prejudice from inadmissible evidence, State v. Vallejo, 198 N.J. 122, 134 (2009). Those criteria were not met here.

The curative instruction was issued as part of the court's final jury charge within the "Function of the Court" section. See Model Jury Charges (Criminal), "Final Charge" (rev. May 12, 2014).

> I may have sustained an objection or objections to some questions asked by counsel which may have contained statements of certain facts. The mere fact that an attorney asks a question and inserts facts, or comments, or opinions in the question in no way proves the existence of those facts.
>
> Specifically, you are to disregard any questions related to statements made to third parties who have not testified. They are not evidence.
>
> You will only consider such facts which in your judgment have been proven by the testimony of witnesses or other . . . or from exhibits admitted into evidence by the court.

[(Emphasis added).][8]

That instruction lacked specificity, referring obliquely to "any questions related to statements made to third parties who have not testified."  The instruction also was "delayed," having been issued two trial days after the prosecutor's erroneous cross-examination concluded.[9]

Nonetheless, we are not convinced defendant was prejudiced by the inquiry.  Murray, 240 N.J. Super. at 394-95.  We therefore consider the prosecutor's line of questioning for harmless error.  See R. 2:10-2 (directing reviewing courts to disregard "[a]ny error or omission . . . unless it is of such a nature as to have been clearly capable of producing an unjust result").  A trial error only warrants reversal of a defendant's conviction if the error raises "'a reasonable doubt' as to whether [it] affected the result reached by the jury." Prall, 231 N.J. at 588 (alteration in original); State v. Weaver, 219 N.J. 131, 154 (2014).

Harmless error may be disregarded by the reviewing court even where the trial court is found to have abused its discretion in admitting evidence and failed

---

[8]  We emphasize the court's addition to the model jury instruction.

[9]  Because the court was in recess during Thanksgiving week, the court did not issue its final charge until twelve calendar days after defendant testified.

to properly instruct the jury.  See Prall, 231 N.J. at 581, 587-88.  We evaluate the error "in light of the overall strength of the State's case."  State v. Sanchez-Medina, 231 N.J. 452, 468 (2018); see also State v. Hightower, 120 N.J. 378, 410 (1990) (finding harmless error where the officer testified defendant "was the person responsible for the murder" in view of "the strength of the State's case, the length of the trial, and the number of witnesses called").

Defendant argues the error was not harmless due to the lack of eyewitness identification and the "scarcity of other evidence apart from admissions, for which there was an explanation."  We disagree.

Defendant's confession to police was replete with details of the events as they unfolded, including the planning of the robbery and the shooting of the attendant.  Many of those details were corroborated by physical evidence admitted at trial.  For example, defendant told police he wanted to bring along his baton, taser and BB gun, all of which were seized from his home and admitted in evidence.  Defendant also provided specific details about the characteristics of the shotgun, its gray fabric case, and the colors and size of the ammunition shells that Torres loaded into the gun, which matched the shotgun, fabric case, and ammunition seized from Torres's residence and admitted in evidence.

Defendant also described the route taken to the gas station and how he removed the Pennsylvania license plates from Michelle's car and replaced them with New Jersey plates from a random car along the way. He explained that Torres went around the back of the building to cut the wires to the surveillance system, and he and Torres waited behind the gas station for the other cars to leave before they approached the attendant.

Defendant precisely described the execution of the robbery and shooting, explaining the attendant "couldn't really speak English very well"[10] so Torres "repeated give me all your money mother fucker and uh, the dude immediately emptied his pockets out and gave him the money." Defendant "grabbed the money out of the cigar box" and Torres demanded Kasam's gold ring, which police later recovered from a pawn shop and was admitted in evidence. Defendant described exactly where Torres shot Kasam: "Like kinda by the booth but kinda in front of the pump and [Torres] was back like five or six feet and he shot him in the leg. I saw his pants ruffle. I didn't really see any, any holes or any blood splatter or anything." Defendant told police Torres: "Angled"

---

[10] Defendant included the audio portion of his video-recorded statements on appeal. Our review of the recording discloses defendant affected an accent when relating Kasam's statements.

the shotgun "down at [Kasam's] knee cap." And, Torres "didn't look around, he didn't take his eyes off of [Kasam] for a second. He looked directly at him, pointed down and went boom." That description was consistent with the opinion of the State's reconstruction expert, who testified the shot was fired on a downward angle.

The jury was afforded the opportunity to assess defendant's credibility during his video-recorded statements to police – which they viewed again during deliberations – and compare his demeanor on the stand when he recanted those statements. The jury also heard the testimony of Warfle and Reed, which was corroborated by the text message exchange between Reed and defendant, including defendant's instructions to delete the incriminating messages. Importantly, the jury was presented with physical evidence that corroborated defendant's account: the BB gun, baton and taser.

Under the totality of those circumstances, we agree with the State that "[t]he jury was presented with sufficient evidence, including [defendant]'s own statements to police, his conversations with third party witnesses, his text messages to [Reed], and the discovery of evidence in [defendant]'s room, to properly find [him] guilty . . . ." Moreover, the prosecutor's erroneous questioning was brief compared with his overall cross-examination of

defendant. And, the prosecutor made no mention of Michelle's statements to police – or defendant's statements to her – in his closing remarks to the jury.

While we do not condone the prosecutor's line of questioning, we are persuaded the prosecutor's error was harmless. See Hightower, 120 N.J. at 410. Compare State v. Branch, 182 N.J. 338, 353-54 (2005) (finding improper admission of hearsay statements implicating the defendant warranted a new trial where, among other things, there was no physical evidence admitted at trial) with State v. Roach, 146 N.J. 208, 226 (1996) (concluding a Confrontation Clause violation was harmless in light of the overwhelming evidence against the defendant, including the defendant's confession recounting "the details of the shooting").

IV.

We turn to defendant's contentions raised in point V. Defendant primarily argues he did not knowingly and voluntarily waive his Miranda rights because "he was barely an adult living with his mother," who persuaded him to confess. Defendant also claims police participated in off-the-record conversations en route to the police station that were not recorded, "raising a reasonable doubt about the State's proofs." We reject these arguments, finding ample evidence in

the record that both defendant's post-arrest statements were the product of his own free will, State v. L.H., 239 N.J. 22, 42 (2019), and properly elicited.

The events that preceded the actual questioning of defendant were fully explored at the evidentiary hearing and in the court's oral decision. The State produced Detective Justin Boyce of the Warren County Prosecutor's Office, who administered the rights before defendant made both statements and conducted the inquiry.[11] Michelle and defendant also testified at the hearing.

As the trial court found, and the recordings reveal, Boyce read defendant his Miranda warnings, and asked whether he understood each right. Defendant replied, "Yes," to each inquiry. Boyce stated he permitted Michelle to speak with defendant, but their conversation occurred after defendant made his second statement. Boyce acknowledged he engaged defendant in "casual conversation" with defendant during the five- to ten-minute ride to the police station. Because defendant did not make any admissions at that time, Boyce did not memorialize their conversation in his report.

Conversely, Michelle testified: "[T]hey told me that they would let me see him if I convinced him to give a confession." Michelle said: "[T]hey put us in

_____

[11] The State introduced the video recordings of both statements through the testimony of another detective, whose testimony was limited to authenticating the recordings.

a room together" and she told defendant "to tell them that he did it." Michelle continued: "It took a while for me to get him to say anything to them at all." Defendant told the court a similar account, stating he was "pretty sure" his mother met with him before he gave his statement "otherwise there would have been no reason for her to try to convince me to give the statement in the first place."

On cross-examination of both witnesses, the prosecutor elicited time frames that shed doubt on the sequencing of the mother-son conversation, as alleged by the defense. The testimony revealed Michelle was present when Alexis gave her statement, which police recorded. The transcript of Alexis's statement reveals a comment by Michelle around 5:39 p.m. that she had been at the police station for about four hours, but had not yet spoken with defendant, whose statement had begun at 5:10 p.m.

In its oral decision, the trial court explained it found Boyce "particularly credible," noting there were no "gaps in his testimony." Conversely, the court discredited the testimony of defendant and his mother, finding Michelle's account sounded "contrived," with "gaps" concerning timeframes. The court therefore believed Boyce's testimony, including the sequencing of Michelle's conversation with defendant. But the court observed no impropriety even had

32                                                                 A-2891-17T1

Michelle spoken with defendant before he confessed, noting defendant cited no authority prohibiting a parent from doing so, or that it would rise to the level of "unwarranted, or illegal . . . use of police trickery, or psychological pressure."

In reaching its decision, the trial court acknowledged it viewed both video recordings of Boyce's Miranda warnings. The court observed defendant's waiver was knowing and intelligent, and his statements were voluntarily made, in light of the totality of the circumstances. The court considered the sufficiency of the warnings; that defendant was "re-Mirandized" before giving his second statement; and he appeared to understand his rights. The court also referenced defendant's age, literacy, and sobriety at the time he waived his rights, and that police made "no threats of inducement."

Our review of the court's determination is limited. We defer to a judge's factual and credibility determinations when, as here, they are supported by evidence in the record. See Dunbar, 229 N.J. at 538. In deferring to the court's findings based on its observations of the witnesses at the hearing and its review of the video recordings of the issuance of the warnings, we find no reason to intervene. See State v. Davila, 203 N.J. 97, 109-10 (2010). We affirm substantially for the reasons set forth in the trial court's sound oral decision.

V.

Little need be said about the contentions raised in point II. The court issued a sequestration order prior to trial, prohibiting the witnesses from discussing their trial testimony. See N.J.R.E. 615. Defendant renews his argument that Reed and Warfle violated the order during their hallway conversation before Reed testified, thereby negatively impacting his attorney's ability to cross-examine the witnesses. Defendant's claim is unavailing.

Warfle and Reed testified in succession at trial and sat together in the hallway outside the courtroom while they waited to testify. On direct-examination, Reed said he had forgotten the couple drove defendant to his father's house the night defendant confessed his involvement in the incident – until Reed spoke with Warfle "in the hallway." Defense counsel immediately moved for a mistrial. The court excused the jury and conducted a hearing pursuant to N.J.R.E. 104, during which Reed confirmed the couple did not discuss Warfle's testimony after she testified; they had spoken before Warfle was called into the courtroom; and Warfle merely refreshed Reed's testimony.

Correctly recognizing the purpose of a sequestration order is to prohibit witnesses from discussing their testimony after they testify at trial, the trial court denied defendant's application, finding the lack of any evidence "that anything

was discussed post-testimony." See State v. Williams, 404 N.J. Super. 147, 160 (App. Div. 2008) (recognizing the purpose of a sequestration order is "to prevent prospective witnesses from hearing what the other witnesses detail in their evidence"); see also State v. DiModica, 40 N.J. 404, 413 (1963). Given our discretionary standard of review, State v. Hyman, 451 N.J. Super. 429, 441 (App. Div. 2017), we discern to reason to disturb the court's ruling.

## VI.

We find insufficient merit in defendant's newly-minted contentions raised in point III – that the video recording was "indiscernible" – to warrant discussion in this written opinion. R. 2:11-3(e)(2). We simply note both of defendant's post-arrest statements were played during trial and during jury deliberations, with no issues whatsoever raised by trial counsel, the prosecutor, the jurors, or the court.

## VII.

In defendant's final point, he challenges his sentence, asserting it exceeds the mandatory-minimum prison term for felony murder by five years. See N.J.S.A. 2C:11-3(b)(1). Defendant essentially argues the trial court improperly considered the "crime itself as an aggravating factor" and failed to consider his role in the offense, his age, and susceptibility to influence by others.

Following appropriate mergers, the trial court imposed a thirty-five-year term of imprisonment on the felony murder conviction and a concurrent three-year prison term for unlawful possession of the shotgun used in the commission of the offense. The court found and assigned "heavy weight" to aggravating factors one (the nature and circumstances of the offense) and two (the gravity of harm to the victim, including his particular vulnerability); and "considerable weight" to aggravating factors on aggravating factors three (the risk defendant will commit another offense) and nine (the need to deter) on the felony murder conviction, N.J.S.A. 2C:44-1(a)(1), (2), (3), and (9). The court also found aggravating factors three and nine on the unlawful possession of a weapon conviction.[12] The court considered the litany of mitigating factors argued by defense counsel, see N.J.S.A. 2C:44-1(b)(1), (2), (7), (8), (9), (10), (11), (12) and (13), but found none applied on any counts of conviction.

"Appellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). Ordinarily, we defer to the sentencing court's

---

[12] The court incorrectly found aggravating factors three and nine also applied on the three counts that it had properly merged with the felony murder count: count two (armed robbery); count three (conspiracy to commit robbery); and count four (possession of a weapon for an unlawful purpose). On remand, the court shall neither impose aggravating factors on the merged counts nor consider their weight in resentencing defendant. The judgment of conviction shall be amended accordingly.

determination, State v. Fuentes, 217 N.J. 57, 70 (2014), and do not substitute our assessment of the aggravating and mitigating factors for that of the trial judge, Miller, 205 N.J. at 127. Relevant to this appeal, we must affirm the sentence, unless: "the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record." Ibid. "Elements of a crime, including those that establish its grade, may not be used as aggravating factors for sentencing of that particular crime," State v. Lawless, 214 N.J. 594, 608 (2013), which "would result in impermissible double-counting." State v. A.T.C., 454 N.J. Super. 235, 254 (App. Div. 2018); see also State v. Yarbough, 100 N.J. 627, 633 (1985). We will remand for resentencing if the sentencing court considers an inappropriate aggravating factor. Miller, 205 N.J. at 129.

At the outset, we discern no error in the trial court's finding of aggravating factor three based on defendant's prior involvement with the law as a juvenile and pending aggravated assault charge against a correction officer while detained on the present offenses. Nor do we find any error in the application of aggravating factor nine, in view of the strong need to deter defendant and others from the senseless violence that underscored his convictions.

We also are not persuaded by defendant's argument that the trial court failed to find mitigating factors two (defendant did not contemplate his actions would cause serious harm) and thirteen (he was substantially influenced by a more mature individual). N.J.S.A. 2C:44-1(b)(2) and (13). As the trial court reasonably determined, mitigating factor two did not apply here, where defendant "agreed to participate in a robbery in which there was a loaded firearm." Although the court recognized defendant was only eighteen years old when he committed the crime, it noted the record was devoid of any evidence defendant was influenced by Torres or Alexis, warranting application of mitigating factor thirteen. Rather, as the trial court noted, defendant apparently convinced Beagell to participate. Moreover, based on our review of the record, the court properly found none of the other six mitigating factors argued by defense counsel applied.

We turn to the court's assessment of aggravating factors one[13] and two. "While sentencing courts frequently apply both aggravating factors one and two, each requires a distinct analysis of the offense for which the court sentences the

---

[13] We recognize defendant's merits brief does not state the court found aggravating factor one. Because defendant generally argued the court impermissibly "used the crime itself as an aggravating factor," we choose to consider the propriety of aggravating factor one.

defendant." Lawless, 214 N.J. at 600. We consider these factors in reverse order.

Aggravating factor two involves an assessment of "[t]he gravity and seriousness of harm inflicted on the victim," taking into account the defendant's knowledge "that the victim of the offense was particularly vulnerable or incapable of resistance due to advanced age, ill-health, or extreme youth, or was for any other reason substantially incapable of exercising normal physical or mental power of resistance . . . ." N.J.S.A. 2C:44-1(a)(2). "Aggravating factor two "focuses on the setting of the offense itself with particular attention to any factors that rendered the victim vulnerable or incapable of resistance at the time of the crime." Lawless, 214 N.J. at 610-11. The factor "does not limit 'vulnerability' to age or other physical disabilities of the victim." State v. O'Donnell, 117 N.J. 210, 218-19 (1989) (finding the victim, who had been "tied up" was "rendered vulnerable within the meaning of [aggravating factor two]").

In applying aggravating factor two, the trial court noted Kasam was "outnumbered and outgunned" and "[o]nce [defendant] made the decision to take part in the armed robbery [he] set in motion circumstances that would leave Mr. Kasam particularly vulnerable" because Kasam was unarmed. "At that point

where [Kasam] was most vulnerable he was shot and left bleeding and [defendant] left him there to die."

In support of its decision, the court's judgment of conviction properly relied on and cited our decision in State v. Faucette, 439 N.J. Super. 241, 272 (App. Div. 2015), where we upheld a finding that a gas station attendant alone at night was "particularly vulnerable." Ibid. Like the victim in Faucette, Kasam was working alone at the BP gas station, when he was shot and killed by his assailants during an armed robbery. Ibid. Defendant told police he and Torres waited until no other cars were present at the gas station before approaching Kasam. In that regard, Kasam was similarly vulnerable as the victim in Faucette. Accordingly, the competent and credible evidence in the record supports the court's finding of aggravating factor two. Miller, 205 N.J. at 127.

We part company, however, with the court's finding of aggravating factor one, which "must be premised upon factors independent of the elements of the crime and firmly grounded in the record." Fuentes, 217 N.J. at 63. Aggravating factor one not only requires consideration of "[t]he nature and circumstances of the offense," but also "the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner . . . ." N.J.S.A. 2C:44-1(a)(1). "In appropriate cases, a sentencing court may justify

the application of aggravating factor one, without double-counting, by reference to the extraordinary brutality involved in an offense." Fuentes, 217 N.J. at 75; State v. Soto, 340 N.J. Super. 47, 71-72 (App. Div. 2001) (applying factor one in an aggravated manslaughter and felony murder case where the defendant brutally and viciously attacked the victim).

As to this factor, the court found: "Kasam was not shot in such a manner that death was instantaneous. Rather, he was shot and left to suffer [a]n agonizing . . . and painful death. He was not armed. He was shot in the leg. The shooting constituted excess force to accomplish the robbery." (Emphasis added). Noting defendant did not fire the shot that killed Kasam, the court found defendant knew Torres was armed with a firearm and "was capable of shooting the victim in such circumstances."

According to the trial record, Kasam was killed by a single gunshot. Although he did not succumb to his wound until two days later, the shooting itself did not "extend[] to the extreme reaches of the prohibited behavior." Fuentes, 217 N.J. at 75. Likewise, the gravity of harm to the victim, i.e., death, is itself an element of first-degree felony murder. While, as the court noted, the shooting exceeded the force necessary to complete the robbery offense, that

conviction merged with defendant's felony murder conviction, for which he was sentenced.

Because the trial court erred in finding aggravating factor one, we remand for reconsideration of defendant's sentence in its absence.

Affirmed in part; remanded in part.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2891-17T1